REVISED MAY 21, 2009

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 15, 2009

Charles R. Fulbruge III
Clerk

―――――――

No. 07-40861

―――――――

KLAMATH STRATEGIC INVESTMENT FUND, by and through St Croix
Ventures (Managing member)

                              Plaintiff - Appellee - Cross-Appellant

v.

UNITED STATES OF AMERICA

                              Defendant - Appellant - Cross-Appellee

_____

KINABALU STRATEGIC INVESTMENT FUND, by and through Rogue
Ventures LLC (Managing member)

                              Plaintiff - Appellee - Cross-Appellant

v.

UNITED STATES OF AMERICA

                              Defendant - Appellant - Cross-Appellee

―――――――

Appeals from the United States District Court
for the Eastern District of Texas

―――――――

Before GARWOOD, GARZA, and OWEN, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

In this tax case, Plaintiffs Klamath Strategic Investment Fund ("Klamath") and Kinabalu Strategic Investment Fund ("Kinabalu") (collectively, the "Partnerships") filed suit against defendant the United States of America for readjustment of partnership items. Both parties appeal various aspects of the district court's readjustment determination. For the following reasons, we affirm in part, vacate in part, and remand.

I

This case involves a highly complex series of financial transactions, which the district court categorized as a tax shelter known as Bond Linked Issue Premium Structure ("BLIPS"). The transactions were undertaken by two law partners, Cary Patterson and Harold Nix. Patterson and Nix's law firm represented the State of Texas in litigation against the tobacco industry and each partner earned around $30 million between 1998 and 2000. Interested in managing this wealth, Patterson and Nix requested their long-time accounting firm, Pollans & Cohen, to investigate investment opportunities.

The accountants identified Presidio Advisory Services ("Presidio"), an investment advisory firm purporting to specialize in foreign currency trading. Presidio advocated a complex plan involving strategic investments in foreign currencies pegged to the U.S. dollar. Patterson and Nix agreed to invest in Presidio's plan. Generally, the Presidio strategy was structured as a three-stage, seven-year investment program. Stage I lasted 60 days and entailed relatively low risk investments. Stage II lasted from day 60 through day 180, and the risk was somewhat higher. Stage III extended from day 180 through the end of the seventh year and involved the highest risk as well as potentially the highest return. At each stage of the plan, Presidio required the investors to contribute significantly more capital. The investors retained the right to exit the plan at the end of Stage I and at each 60-day period thereafter.

To implement the strategy Presidio formed Klamath and Kinabalu as limited liability companies, taxed as partnerships. Next, Presidio formed two single-member LLCs, which are disregarded for tax purposes: St. Croix for Patterson and Rogue for Nix. Patterson owned 100% of St. Croix, and St. Croix became a 90% partner of Klamath. The other 10% partners of Klamath were Presidio Resources LLC and Presidio Growth LLC. Presidio Growth was the managing partner. Kinabalu had a similar structure. Nix owned 100% of Rogue, and Rogue was a 90% partner of Kinabalu. The other 10% partners of Kinabalu were Presidio Growth and Presidio Resources, with Presidio Growth acting as the managing partner.

To fund Klamath and Kinabalu, Patterson and Nix (acting through St. Croix and Rogue) made two distinct contributions. First, they each contributed $1.5 million to their respective partnership. Second, they entered into loan transactions with National Westminster Bank ("NatWest"), where the bank loaned each company $66.7 million. This included $41.7 million denominated as the "Stated Principal Amount" and $25 million as a "loan premium." The classification of the $25 million as something different than the principal loan amount is central to this case. The loan premium was given in exchange for Patterson and Nix paying NatWest a higher than market interest rate on the principal: 17.97%. To protect NatWest from the possibility that the loans would be repaid early and the benefit of the higher interest rate would not be realized, the credit agreements required that a prepayment amount be paid if the loans were paid off early. The prepayment amount would vary depending on when the loan was repaid, starting at about $25 million and decreasing over seven years. After year seven, no prepayment amount would apply.

Patterson and Nix each contributed the $66.7 million to Klamath and Kinabalu and assigned the corresponding loan obligations to the Partnerships. The Partnerships deposited the funds into accounts controlled by NatWest.

Presidio directed Klamath and Kinabalu to use these funds to purchase very low risk contracts on U.S. dollars and Euros. They also made small, short 60- to 90-day term forward contract trades in foreign currencies. These were the only investments the Partnerships ever made, and Patterson and Nix elected to withdraw from Klamath and Kinabalu before the end of Stage I. They received cash and Euros on liquidation, and they sold the Euros in 2000, 2001, and 2002.

On their income tax returns for 2000, 2001, and 2002, Patterson claimed total losses of $25,277,202 arising from Klamath's activities and Nix claimed total losses of $25,272,344 arising from Kinabalu's. These massive losses occurred because each partner claimed a significant tax basis in their respective partnership. Generally, a partner's basis in a partnership is determined by the amount of capital he contributes to the partnership, and when a partnership loses money the partners can only deduct the losses from their taxable income to the extent of their basis in the partnership. When a partnership assumes a partner's individual liabilities, the liability amount is subtracted from the partner's basis.[1] Patterson and Nix were able to report such high losses because when they each calculated their basis in the partnership, they did not reduce it by the $25 million loan premium amount. When Patterson and Nix contributed the $66.7 million plus the $1.5 million to Klamath and Kinabalu, they would have each had a $68.2 million basis in their partnership. However, the Partnerships also assumed the loan obligations, so Patterson and Nix's bases had to be reduced by the amount of the liabilities. Patterson and Nix did not consider the loan premiums to be liabilities, so they only subtracted the $41.7 million principal amount. Therefore, each claimed a taxable basis in the partnership in excess of $25 million. This meant that when Patterson and Nix

---

[1] These rules are defined in 26 U.S.C. § 752 et seq. of the Internal Revenue Code, described more fully below.

sold the Euros, they were able to deduct over $25 million from their taxable income.[2]

The IRS disagreed with this basis calculation, and in 2004 issued Final Partnership Administrative Adjustments ("FPAAs") to Klamath and Kinabalu stating that under 26 U.S.C. § 752 of the Internal Revenue Code (the "Code"), the partners should have treated the entire $66.7 million as a liability. Alternatively, the IRS argued that the transactions were shams or lacked economic substance and should be disregarded for tax purposes. The FPAAs also made adjustments to operational expenses reported by the Partnerships and asserted accuracy-related penalties. Patterson and Nix paid the taxes owed based on the FPAAs, and then re-formed the partnerships in order to seek readjustment in the district court.

The Partnerships filed suit against the Government under 26 U.S.C. § 6226 for readjustment of partnership items. The Partnerships moved for partial summary judgment, and the Government cross-moved for summary judgment on the issue of whether the partners' tax bases were properly calculated; specifically, whether the loan premiums constituted liabilities under § 752 of the

---

[2] Specifically, the losses occurred from the following. Patterson received 67,341.88 Euros when Klamath liquidated. He treated these Euros as having a tax basis of $25,316,393, calculated as:

| | |
|---|---|
| Premium amount | 25,000,000 |
| Cash contributions | 1,500,000 |
| Interest income | 91,307 |
| Advisory fee to Pollans & Cohen | 250,000 |
| Cash distributions from Klamath | (359,635) |
| Klamath partnership loss | (1,165,279) |
| | |
| Basis | 25,316,393 |

This meant that since Patterson was able to treat the loan premium as money he had put into the partnership (i.e. not a liability that the partnership had to repay), he could claim a tax basis of $365.94 in each Euro he received from Klamath. When he sold the Euros for much less than this amount, large losses were created. Nix's basis calculation was nearly identical.

Code. The district court granted the Partnerships' motion and denied the Government's, holding that the loan premiums were not liabilities under § 752 and therefore the partners' bases were properly calculated under the Code. However, following a bench trial the district court held that the loan transactions must nonetheless be disregarded for federal tax purposes because they lacked economic substance. The district court also concluded that the penalties asserted by the IRS did not apply and the Partnerships' operational expenses were deductible. The Government moved the court to reconsider and vacate its summary judgment decision, arguing that the decision was mooted by the bench trial judgment. The court denied this motion. Finally, the court issued an order holding that it had jurisdiction to order a refund to the Partnerships, and that Patterson and Nix could deduct the $250,000 management fee paid to their accountants.

The Government appeals the district court's partial summary judgment in favor of the Partnerships, arguing that the "loan premiums" constitute liabilities under § 752. The Government also argues that the Partnerships are liable for penalties, that operating expenses and fees may not be deducted, and that the district court lacked jurisdiction to order a refund to the Partnerships. The Partnerships cross-appeal the district court's bench trial judgment, arguing that the loan transactions had economic substance.

II

We review the district court's grant of summary judgment de novo, applying the same standard as the district court. Kornman & Assocs. v. United States, 527 F.3d 443, 450 (5th Cir. 2008). On appeal from a bench trial, we review findings of fact for clear error and legal issues de novo. Houston Exploration Co. v. Halliburton Energy Servs., Inc., 359 F.3d 777, 779 (5th Cir. 2004). Specifically, we have held that a district court's characterization of a transaction for tax purposes is a question of law subject to de novo review, but

the particular facts from which that characterization is made are reviewed for clear error. See Compaq Computer Corp. and Subsidiaries v. Comm'r, 277 F.3d 778, 780 (5th Cir. 2001) (citing Frank Lyon Co. v. United States, 435 U.S. 561, 581 n.16 (1978)).

III

We first consider the Partnerships' cross-appeal, namely whether the district court erred in determining that the loan transactions lacked economic substance and must be disregarded for tax purposes.

The economic substance doctrine allows courts to enforce the legislative purpose of the Code by preventing taxpayers from reaping tax benefits from transactions lacking in economic reality. See Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353-54 (Fed. Cir. 2006). As the Supreme Court has recognized, taxpayers have the right to decrease or avoid taxes by legally permissible means. See Gregory v. Helvering, 293 U.S. 465, 469 (1935). However, "transactions[ ] which do not vary control or change the flow of economic benefits[ ] are to be dismissed from consideration." See Higgins v. Smith, 308 U.S. 473, 476 (1940). In a more recent pronouncement, the Supreme Court held that "[w]here . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties." Frank Lyon, 435 U.S. at 583-84.

The law regarding whether a transaction should be disregarded as lacking economic reality is somewhat unsettled in the Fifth Circuit, and a split exists among other Circuits. The Fourth Circuit applies a rigid two-prong test, where a transaction will only be invalidated if it lacks economic substance and the taxpayer's sole motive is tax avoidance. See Rice's Toyota World, Inc. v. Comm'r,

752 F.2d 89, 91-92 (4th Cir. 1985). The majority view, however, is that a lack of economic substance is sufficient to invalidate the transaction regardless of whether the taxpayer has motives other than tax avoidance. See, e.g., Coltec, 454 F.3d at 1355; United Parcel Serv. of Am., Inc. v. Comm'r, 254 F.3d 1014, 1018 (11th Cir. 2001); ACM Partnership v. Comm'r, 157 F.3d 231, 247 (3d Cir. 1998); James v. Comm'r, 899 F.2d 905, 908-09 (10th Cir. 1990). We have previously declined to explicitly adopt either approach. See Compaq, 277 F.3d at 781-82 (finding that the transaction in question had both economic substance and a legitimate business purpose, so it would be recognized for tax purposes under either the minority or majority approach).

We conclude that the majority view more accurately interprets the Supreme Court's prescript in Frank Lyon. The Court essentially set up a multi-factor test for when a transaction must be honored as legitimate for tax purposes, with factors including whether the transaction (1) has economic substance compelled by business or regulatory realities, (2) is imbued with tax-independent considerations, and (3) is not shaped totally by tax-avoidance features. See Frank Lyon, 435 U.S. at 583-84. Importantly, these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes. Thus, if a transaction lacks economic substance compelled by business or regulatory realities, the transaction must be disregarded even if the taxpayers profess a genuine business purpose without tax-avoidance motivations.

The following facts found by the district court are critical to this issue: Presidio and NatWest understood that the transactions would not last beyond Stage I, despite the purported seven-year term—meaning that the high risk foreign currency transactions were never intended to occur. If the investors failed to withdraw voluntarily, NatWest could use economic pressure to force them out because the credit agreements required the borrowers to maintain

collateral on deposit at NatWest that exceeded the value of the maximum obligations owed to the bank by some varying amount. At the time the loans were issued, this amount was at least 101.25% of the total $66.7 million. NatWest had the discretion to determine whether the ratio was satisfied and could accelerate the ratio to declare a default if the bank wished to force an investor to withdraw. This requirement also meant that none of the $66.7 million loan could ever be used for investments—it had to stay in the accounts at NatWest. NatWest and Presidio understood that the bank would hold the money in relatively risk-free time deposits. Presidio's management fee was calculated as a percentage of the tax losses generated by the investment plan. The district court determined, however, that Patterson and Nix pursued the transactions with a genuine profit motive and were not solely driven by the desire to avoid taxes.

Here, the evidence supports the district court's conclusion that the loan transactions lacked economic substance. Numerous bank documents stated that despite the purported seven-year term, the loans would only be outstanding for about 70 days. NatWest's profit in the loan transactions was calculated based on a 72-day period. In the event that the investors wanted to remain with the plan beyond 72 days, NatWest would force them out. The bank noted in an internal memo that it "had no legal or moral obligation to deal [with the investors] after Day 60." During that 60- to 70-day window the loan funds could not be used to facilitate the investment strategy that Presidio designed. The requirement of keeping at least 101.25% of the $66.7 million in the NatWest account meant, as the Government's expert testified, that the Partnerships could not make any investments without supplying their own funds in excess of the loan amount.

The Partnerships contend that the loan funds were critical to the high-risk foreign currency transactions even if the funding amount could not be spent

because the money provided the necessary security for the high-risk transactions. However, the structure of the plan shows that these high-risk transactions could not occur until Stage III, which was never intended to be reached. As the district court found, NatWest would force the investors out long before Stage III, so the loan transactions served no real purpose beyond creating a massive tax benefit for Nix and Patterson.

The Partnerships further argue that the loan transactions had a reasonable possibility of profit, as evidenced by the fact that two small, low-risk investments were actually made in foreign currencies. However, these investments were made using the $1.5 million that Patterson and Nix contributed to the Partnerships, not the funding amounts of the loans. Various courts have held that when applying the economic substance doctrine, the proper focus is on the particular transaction that gives rise to the tax benefit, not collateral transactions that do not produce tax benefits. See Coltec, 454 F.3d at 1356-57; Nicole Rose Corp. v. Comm'r, 320 F.3d 282, 284 (2d Cir. 2002). Here, the transactions that provided the tax benefits at issue were the loans from NatWest. Therefore, the proper focus is on whether the loan transactions presented a reasonable possibility of profit, not whether the capital contributions from Patterson and Nix could have produced a profit. The loan transactions could never have been profitable because the funding amount could not actually be used for investments, and the high-risk investments for which the funding amount might have provided security were never intended to occur.

The evidence clearly shows that Presidio and NatWest designed the loan transactions and the investment strategy so that no reasonable possibility of profit existed and so that the funding amount would create massive tax benefits but would never actually be at risk. Regardless of Patterson and Nix's desire to make money, they entered into transactions controlled by Presidio and NatWest that were not structured or implemented to make a profit. This particular

situation highlights the logic of following the majority approach to the economic substance doctrine, because the minority approach would allow tax benefits to flow from transactions totally lacking in economic substance as long as the taxpayers offered some conceivable profit motive. In cases such as the instant one, this approach would essentially reward a "head in the sand" defense where taxpayers can profess a profit motive but agree to a scheme structured and controlled by parties with the sole purpose of achieving tax benefits for them. We therefore agree with the district court that since the loan transactions lacked economic substance, they must be disregarded for tax purposes.

IV

Next we consider the Government's appeal, namely whether the district court properly granted the Partnerships' motion for partial summary judgment, declined to impose various penalties on the Partnerships, allowed the Partnerships to deduct operational expenses and fees, and ordered a refund.

A

The Government argues that the district court erred in granting the Partnership's motion for partial summary judgment, determining that the loan premiums were not liabilities for purposes of § 752. The Government states in its brief that they are appealing this issue "as a protective matter, due to possible collateral estoppel implications" in several lawsuits pending against Presidio in California.

Despite this adverse summary judgment ruling, the Government ultimately prevailed at trial on economic substance grounds and received the relief it requested when the loan transactions were disregarded for tax purposes. As a general matter, a party who is not aggrieved by a judgment does not have standing to appeal it. See Ward v. Santa Fe Indep. Sch. Dist., 393 F.3d 599, 603 (5th Cir. 2004). In some situations, adverse collateral estoppel implications may show that a party is aggrieved by a particular ruling. See In re DES Litig., 7

F.3d 20, 23 (2d Cir. 1993). However, an interlocutory ruling will only have collateral estoppel effect in subsequent litigation if the ultimate judgment in the case was dependent upon the interlocutory ruling. Id. (finding that a prevailing party had no standing to appeal adverse interlocutory rulings, regarding jurisdiction and choice of law, because the ultimate judgment in the case was not dependent on those rulings). Accordingly, where a party who ultimately prevails in a case attempts to show they have standing to appeal an earlier adverse ruling by arguing that the earlier ruling could have collateral estoppel effect in other pending cases, standing will only exist where the ultimate judgment in the case was "dependent" on the earlier adverse ruling. Id.

Here, the district court's summary judgment ruling has no collateral estoppel effect. The judgment following the bench trial was entirely based on the district court's conclusion that the loan transactions lacked economic substance and must be disregarded for tax purposes. This determination was totally independent of the partial summary judgment ruling that the loan premiums were not liabilities under § 752. Though the Government further argues that "[i]t could be concluded that [it] is aggrieved by the [summary] judgment [ruling] to the extent it played a part in the District Court's rejection of the IRS's imposition of penalties," we conclude that the district court's penalty decision was likewise not dependent on the partial summary judgment determination. Therefore, we hold that the Government lacks standing to appeal the district court's partial summary judgment ruling that neither § 752 nor Treas. Reg. § 1.752-6 operates to eliminate the claimed tax benefits arising from the Partnerships' participation in the loan transactions.

B

The Government also appeals the district court's ruling that no penalties may be imposed on the Partnerships.[3] The district court found that the Partnerships' actions did not meet the statutory requirements for imposition of the penalties, and that even if they were met, none of these penalties apply because the Partnerships acted in good faith and with reasonable cause. Specifically, the Government argues that the district court erred in finding that the Partnerships' actions did not meet the statutory requirements for the imposition of penalties, and that the district court lacked jurisdiction to consider the reasonable cause and good faith defenses. Since the issue of whether the Partnerships' conduct met the requirements for the penalties is moot if the district court had jurisdiction to consider the reasonable cause and good faith defenses, we first consider the jurisdictional issue.

This issue is governed by the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), 26 U.S.C. §§ 6221-6233. Under TEFRA, "the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level." 26 U.S.C. § 6221. TEFRA specifically sets forth the scope of judicial review:

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates; the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

---

[3] In the FPAAs, the IRS asserted four penalties against the Partnerships, all based on § 6662 of the Code: (1) a 40% penalty for gross valuation misstatement; (2) a 20% penalty for substantial valuation misstatement; (3) a 20% penalty for substantial understatement of income tax; and (4) a 20% penalty for negligence or disregard of rules and regulations. See 26 U.S.C. § 6662(a), (b)(1), (2), (3).

26 U.S.C. § 6226(f) (emphasis added). This provision clearly grants the district court jurisdiction to determine the applicability of any penalty relating to an adjustment of a partnership item. The Code also makes clear that if a taxpayer acts in good faith and with reasonable cause in the calculation of his or her taxes, penalties may not be applied: "[n]o penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1).

The Government argues that the district court lacked jurisdiction to consider the reasonable cause and good faith defense because the court's jurisdiction in a TEFRA proceeding is limited to assessment of partnership-level items. Here, the Government claims, reasonable cause and good faith is a partner-level defense that can only be asserted in separate refund proceedings. To support this argument, the Government cites Temporary Treasury Regulation § 301.6221-1T, which states that assessment of penalties or any addition to tax related to partnership items is determined at the partnership level, and "[p]artner-level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions following assessment and payment." Temp. Treas. Reg. § 301.6221-1T(c)-(d) (1999).[4] The regulation defines partner-level defenses as "those that are personal to the partner or are dependent upon the partner's separate return and cannot be determined at the partnership level . . .

---

[4] This regulation was temporary for the taxable years at issue. See Temporary Proced. & Admin. Regs., 64 Fed. Reg. 3838 (Jan. 26, 1999). However, it was made final and applicable to partnership taxable years beginning on or after Oct. 4, 2001. See § 301.6221-1(f), Proced. & Admin. Regs.

[including] . . . whether the partner has met the criteria of . . . section 6664(c)(1) (reasonable cause exception)." Temp. Treas. Reg. § 301.6221-1T(d).

The TEFRA structure enacted by Congress does not permit a partner to raise an individual defense during a partnership-level proceeding, but when considering the determination of penalties at the partnership level the court may consider the defenses of the partnership. See New Millennium Trading, LLC v. Comm'r, 131 T.C. No. 18, 2008 WL 5330940 at * 7 (2008). Though Temp. Treas. Reg. § 301.6221-1T(d) lists the reasonable cause exception as an example of a partner-level defense, it does not indicate that reasonable cause and good faith may never be considered at the partnership level. Several courts have found that a reasonable cause and good faith defense may be considered during partnership-level proceedings if the defense is presented on behalf of the partnership. See Santa Monica Pictures v. Comm'r, 89 T.C.M. 1157, 1229-30 (2005) (considering the reasonable cause and good faith defense asserted by the partnership to determine whether accuracy-related penalties should apply); See also Stobie Creek Investments, LLC v. United States, 82 Fed. Cl. 636, 703-04, 717-21 (2008) (considering the reasonable cause defense at the partnership level). Here, reasonable cause and good faith were asserted on behalf of Klamath and Kinabalu, by the current managing partners. Accordingly, we hold that the district court did not err in considering the defenses.

The plaintiff bears the burden of proof on a reasonable cause defense. See Montgomery v. Comm'r, 127 T.C. 43, 66 (2006). The most important factor is the extent of the taxpayer's effort to assess his proper liability in light of all the circumstances. Treas. Reg. § 1.6664-4(b). Reliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith; rather, the validity of this reliance turns on "the quality and objectivity of the professional advice which they obtained." Swayze v. United States, 785 F.2d 715, 719 (9th Cir. 1986). The district court found that Patterson

and Nix sought legal advice from qualified accountants and tax attorneys concerning the legal implications of their investments and the resulting tax deductions. They hired attorneys to write a detailed tax opinion, providing the attorneys with access to all relevant transactional documents. This tax opinion concluded that the tax treatment at issue complied with reasonable interpretations of the tax laws. At trial, the Partnerships' tax expert concluded that the opinion complied with standards established by Treasury Circular 230, which addresses conduct of practitioners who provide tax opinions. Overall, the district court found that the Partnerships proved by a preponderance of the evidence that they relied in good faith on the advice of qualified accountants and tax lawyers.

The Government argues only that the district court lacked jurisdiction to consider the reasonable cause and good faith defense; it has not alleged error in the substance of the district court's finding that Patterson and Nix acted with reasonable cause and in good faith. Therefore, having concluded that the district court had jurisdiction to consider this defense, we affirm the district court's conclusion that no penalties should apply.

C

The Government also appeals the district court's order that the Partnerships may deduct "operational expenses" associated with the loan and foreign currency transactions. These operational expenses include interest on the loans, a breakage fee, a management fee paid to Presidio, and a $250,000 fee paid to Pollans & Cohen.[5] The Government argues that the district court erred because no deduction may be taken for expenses related to a sham transaction.

The Code governs the deductibility of actual economic expenditures. Although the district court did not specify the provision under which the

---

[5] The Government concedes the deductibility of the trading losses suffered by the Partnerships in the foreign currency transactions.

operating expenses are deductible, the Partnerships argue that they are entitled to the deductions under 26 U.S.C. §§ 163, 165(c)(2), and 212. Section 163 governs the deductibility of interest expenses, stating generally that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163(a). Under § 165, deductions are permitted for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). Particularly, deductions for losses of individuals are limited to "losses incurred in any transaction entered into for profit . . . ." 26 U.S.C. § 165(c)(2). Section 212 allows deductions for "all the ordinary and necessary expenses paid or incurred during the taxable year [ ] for the production or collection of income." 26 U.S.C. § 212.

Generally, when a transaction is disregarded for lack of economic substance, deductions for costs expended in furtherance of the transaction are prohibited. See Winn-Dixie Stores, Inc. v. Comm'r, 113 T.C. 254, 294 (1999) (observing that "a transaction that lacks economic substance is not recognized for Federal tax purposes" and that "denial of recognition means that such a transaction cannot be the basis for a deductible expense"); see also Salley v. Comm'r, 464 F.2d 479, 483 (5th Cir. 1972); Lerman v. Comm'r, 939 F.2d 44, 45 (3d Cir. 1991); Kirchman v. Comm'r, 862 F.2d 1486, 1490 (11th Cir. 1989). This makes sense in light of the fact that the effect of disregarding a transaction for lack of economic substance is that, for taxation purposes, the transaction is viewed to have never occurred at all.[6] Courts have determined that they may

---

[6] The Partnerships rely extensively on Fabreeka Prods. Co. v. Comm'r, 34 T.C. 290, 299-300 (1960), vacated on other grounds by 294 F.2d 876 (1st Cir. 1961), for the proposition that operational expenses incurred in connection with a sham transaction may be deducted as long as they are "separable" from the underlying transaction. To the extent that this proposition can be supported by the since-vacated opinion in Fabreeka, we conclude that the Tax Court has subsequently failed to follow Fabreeka's approach to the deduction of operational expenses, and has instead maintained that expenses incurred in connection with a sham transaction are generally not deductible. See Winn-Dixie, 113 T.C. at 294 (finding that administrative fees "were incurred in connection with, and were an integral part of, a sham

not disregard a transaction for some purposes but not for others. See ACM P'ship, 157 F.3d at 261 (observing that "we are not aware of any cases applying the economic substance doctrine selectively to recognize the consequences of a taxpayer's actions for some tax purposes but not others"). This also supports the idea that a transaction may not be disregarded under the economic substance doctrine for purposes of determining a partner's tax basis in a partnership, yet still support the deduction of operational expenses and fees. However, courts have upheld deductions based on genuine debts, where the debts are elements of a transaction that overall is lacking in economic substance. See Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 95-96 (4th Cir. 1985) (allowing deductions based on recourse note debt that was an element of a sham purchase transaction, because the notes represented actual indebtedness).

Here, the district court concluded that the interest payments were deductible because they were real economic losses. However, § 163 does not base the deductibility of interest on whether or not the interest paid was a real economic loss. Rather, the test is simply whether the interest was paid or accrued on indebtedness. See Salley, 464 F.2d at 485 (disallowing interest deductions under § 163 because the taxpayers did not take on actual indebtedness: "[i]n no sense can it be said that taxpayers paid any interest . . . as compensation for the use or forbearance of money . . . which is the standard business test of indebtedness") (internal quotations and citation omitted). Further, "the fact that an enforceable debt exists between the borrower and lender is not dispositive of whether interest arising from that debt is deductible under section 163." Winn-Dixie Stores, 113 T.C. at 279. The overall transaction must have economic substance in order to show genuine indebtedness, otherwise

transaction and, as a result, were not deductible").

"every tax shelter . . . could qualify for an interest expense deduction as long as there was a real creditor in the transaction that demanded repayment." Id.

In concluding that the loan transactions in this case lacked economic substance, the district court found that "[i]n truth, NatWest did not make any loans" and "[t]he loans . . . were not loans at all." These findings preclude the conclusion that the Partnerships took on actual indebtedness. As we found above, the loan transactions in this case lacked economic substance partly because they were structured such that the Partnerships could never actually spend the loaned funds—101.25% of the funding amount had to stay in the accounts at NatWest to prevent a default. Therefore, despite the appearance of a loan, functionally the Partnerships never took on any actual debt. Since the loans did not constitute indebtedness, the Partnerships may not deduct the interest paid under § 163.[7]

Presumably, though not specified, the district court found the remainder of the operating expenses and fees deductible under § 212 as necessary expenses incurred. This provision requires a profit motive. See Agro Science, 934 F.2d at 576 (noting that an expenditure is deductible under § 212 "only . . . if the facts and circumstances indicate that the taxpayer made them primarily in furtherance of a bona fide profit objective independent of tax consequences"). The Government argues that the profit motive must be determined based on Presidio's subjective intentions because Presidio acted as managing partner when the transactions occurred. The district court, however, determined that the proper focus is on the motives of Patterson and Nix. Having concluded that Patterson and Nix entered into the transactions genuinely seeking to make a profit, the district court allowed the deductions.

---

[7] The Partnerships may likewise not deduct interest under other provisions of the Code as a business expense or an expense paid for the production of income. See Salley, 464 F.2d at 483 (noting that if lack of economic substance prevents the deduction of interest under § 163, the interest is likewise not deductible under §§ 162(a) or 212).

The profit motive of a partnership is determined at the partnership level. Id.; Simon v. Comm'r, 830 F.2d 499, 507 (3d Cir. 1987). We have previously observed that the "testimony of general partners and promoters taken as a whole is relevant in determining a partnership's profit motive, because these individuals control a partnership's activities." Agro Science, 934 F.2d at 576 (internal citations omitted). Here, the district court concluded that the partners had different motivations: Nix and Patterson at all times pursued the investment strategy with a genuine profit motive, while Presidio's primary intent was to achieve a tax benefit. The crucial inquiry, then is which partner's intentions should be attributed to the Partnership. Under Agro Science, this answer depends on which partner effectively controlled the partnership's activities. Id.; Simon, 830 F.2d at 507 (observing that "a determination of [a partnership's] profit objective can only be made with reference to the actions of those . . . who manage the partnership affairs").

During the time of the transactions in question, Presidio acted as the managing partner but had less than 10% ownership of Klamath and Kinabalu. Patterson and Nix each had 90% ownership. After reforming the Partnerships to bring this lawsuit they became managing partners. Though Patterson and Nix were never limited partners, the LLC agreements state that "the overall management and control of the business and affairs of the Company shall be vested solely in the Managing Member." The district court, however, did not analyze which partner retained control over the partnership. The district court appears to have concluded, with little explanation, that Patterson and Nix's motives must be attributed to the Partnerships because they paid the expenses at issue here and reported them on their individual tax returns.[8] However, for

---

[8] In its brief, the Government contends that it was the Partnerships that paid the expenses, citing to Plaintiff's Exhibits 49, 50, 142, and 143. Since these exhibits have apparently not made it into the record on appeal, and have not been able to be obtained from the district court, we cannot verify the Government's contention. Nonetheless, whether it was

purposes of determining the deductibility of expenses it is the motive of the Partnership that matters, regardless of whether certain operating expenses were borne by one partner or another. None of the arguments articulated by the Partnerships or the district court persuade us that the motives of Patterson and Nix, to whom the overall control and management of the Partnerships was expressly denied under the LLC agreements, should be attributed to the Partnerships. We therefore hold that the district court erred as a matter of law by failing to consider which partners effectively controlled the management of the Partnerships' affairs, at the time the transactions occurred, in determining whether the operating expenses and fees are deductible.

D

We turn now to the Government's argument that the district court lacked jurisdiction to order a refund.

The district court based its authority to order the refund on its jurisdiction to order readjustment of partnership items, see 26 U.S.C. § 6226(f), and the Code provision stating that a partner should not have to file a claim for a refund following this readjustment. See 26 U.S.C. § 6230(d)(5) ("any overpayment by a partner which is attributable to a partnership item (or an affected item) and which may be refunded under this subchapter [26 U.S.C. §§ 6221 et seq.], to the extent practicable credit or refund of such overpayment shall be allowed or made without any requirement that the partner file a claim therefor"). The district court interpreted this provision to mean that it may order a refund following a readjustment of partnership items under § 6226, since the refund is permitted without the taxpayers filing a claim.

---

an individual partner or the Partnership that paid the expenses is not dispositive of the issue of who effectively controlled the Partnerships' activities, and we conclude that the district court erred in relying on this fact to allow the deductions.

The Government argues, however, that the Code imposes a strict "exhaustion of administrative remedies" jurisdictional prerequisite with respect to tax refund actions, and that nothing in the Code grants the district court the authority to eliminate this prerequisite by ordering a refund as part of readjustment proceedings under § 6226. As the Government contends, § 6230(d)(5) only grants the IRS the authority to provide a refund attributable to partnership items without requiring the party to file a claim first—it does not expand the district court's specifically defined jurisdiction to include the authority to order a refund.

We have not previously confronted this question, and the few cases available reach mixed conclusions. The Government cites an unpublished opinion from the Ninth Circuit holding that "a district court does not have jurisdiction to order a refund in an action brought pursuant to 26 U.S.C. § 6226." See Gold Coast Hotel and Casino v. United States, 139 F.3d 904, 1998 WL 74991, at *2 (9th Cir. 1998) (unpublished). Another court has ordered refunds in a § 6226 action, though it did not explain its jurisdictional basis for doing so, and the Second Circuit reversed on appeal such that no refund was ultimately awarded. See TIFD III-E Inc. v. United States, 342 F. Supp. 2d 94, 121-22 (D. Conn. 2004), rev'd on other grounds, 459 F.3d 220 (2d Cir. 2006).

We conclude that the Code does not grant the district jurisdiction to order a refund in a readjustment action brought pursuant to § 6226. This provision specifically sets forth the scope of the district court's jurisdiction in readjustment proceedings. See § 6226(f). Though the provision specifies the district court's jurisdiction to determine partnership items, allocate those items to individual partners, and apply penalties, taxes, or additional amounts, it does not grant jurisdiction to order a refund.

Generally, no suit or proceeding may be maintained for the recovery of a refund "until a claim for refund or credit has been duly filed with the Secretary

. . . ." See § 7422(a). Section 7422(h) provides a special rule for refund actions with respect to partnership items: "No action may be brought for a refund attributable to partnership items . . . except as provided in section 6228(b) or section 6230(c)." The applicable provision here, § 6230(c), does not grant refund authority to the district court; rather, it sets forth the grounds on which a partner of a TEFRA partnership may file an administrative refund claim following a final partnership administrative adjustment. Specifically, a partner may file a claim for refund on the grounds that (1) the Secretary failed to allow a credit or to make a refund to the partner in the amount of the overpayment attributable to the application to the partner of a settlement, a final partnership administrative adjustment, or the decision of a court in an action brought under § 6226, or (2) the Secretary erroneously imposed any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item. See § 6230(c)(1)(B)-(C).

We agree with the Government that the provision upon which the district court based its jurisdiction, § 6230(d)(5), merely contemplates that "to the extent practicable" the IRS may grant a refund for an overpayment attributable to partnership items without any requirement that the partner file an administrative claim. Nothing in § 6230(d)(5) authorizes the district court to grant a refund pursuant to readjustment proceedings under § 6226, and it would be unreasonable to conclude that this provision—which is not referenced in § 6226(f) and is placed under the heading "Additional administrative proceedings"—alters the clearly defined limits of a district court's jurisdiction in readjustment proceedings.

We accordingly hold that the district court was without jurisdiction to order a refund. The Partnerships may seek a refund through administrative proceedings, as governed by § 7422.

V

For the foregoing reasons, we AFFIRM the district court's judgment that the loan transactions lacked economic substance and must be disregarded for tax purposes.   We also AFFIRM the district court's judgment that no penalties apply.  We VACATE the district court's order allowing the deduction of interest and operating expenses and REMAND for reconsideration in accordance with this opinion.   We also VACATE the district court's order directing the IRS to grant the Partnerships a refund.