# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 31, 2014

Lyle W. Cayce
Clerk

No. 13-10799

SALTY BRINE I, LIMITED,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

———————————————

THOMAS & KIDD OIL PRODUCTION, LIMITED, By and
Through Thomas/Kidd – Texas Operating Co., Incorporated,
Tax Matters Partner,

Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

No. 13-10799

Before DAVIS, ELROD, and COSTA, Circuit Judges.[1]

W. EUGENE DAVIS, Circuit Judge:

Plaintiff Thomas & Kidd Oil Production, Ltd. ("TKOP") appeals from the district court's determination, after a nine-day bench trial, that the transfer of certain overriding royalty interests through a complicated transaction was an invalid attempt to assign income. The record amply supports this finding and supports the district court's conclusion that the income was taxable to TKOP for the 2006 tax year. We affirm.

## I. Introduction

On April 5, 2010, The Commissioner of Internal Revenue issued a Notice of Final Partnership Administrative Adjustment to TKOP for the tax year ending December 31, 2006, establishing what the IRS believes to be TKOP's total tax liability. TKOP deposited the amount required by 26 U.S.C. § 6226(e) with the IRS, then commenced this action seeking readjustment of partnership items, which was consolidated with seven lawsuits under the *Salty Brine I* caption. The district court had jurisdiction under 26 U.S.C. § 6226(a) and 28 U.S.C. § 1346(e), and we have jurisdiction over this timely appeal under 26 U.S.C. § 6226(g) and 28 U.S.C. § 1291.

TKOP disputed the determination of several partnership items before the district court, including whether TKOP's purchase of so-called Business Protection Policies ("BPPs") resulted in deductible business expenses, and whether the transfer of certain overriding royalty interests by TKOP was an invalid attempt to assign income that should have been taxed to it.

The district court ultimately concluded that the purchase of the BPPs did not result in deductions and that the transfer of the overriding royalties should be disregarded and the royalty income assigned to TKOP instead.

---

[1] Judge Elrod concurs in all parts of this opinion except Part III.B.

No. 13-10799

TKOP has appealed only the overriding royalty determination, but it is necessary to discuss the BPP scheme because both the BPP scheme and the royalty transaction concerned some of the same business entities and methods.

## II. Factual Background

This case largely turns on the complicated facts surrounding the overriding royalty interest transaction, which the district court addressed in a detailed order.

> In an appeal from a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo. "Specifically, a district court's characterization of a transaction for tax purposes is a question of law subject to de novo review, but the particular facts from which that characterization is made are reviewed for clear error."[2]

We take our facts from the district court's findings, which are not clearly erroneous.

## A.  TKOP's Ownership

The district court found that the ultimate taxpayers, John Thomas and Lee Kidd, own and operate a group of oil and gas related businesses based in West Texas, including TKOP.  The district court noted that Thomas and Kidd did not own their businesses directly, but rather owned them through the trusts and investment partnerships that were involved in the BPP and royalty interest transaction.  Thomas and Kidd owned TKOP through two grantor trusts, the Kidd Living Trust and Thomas Living Trust; and two additional investment partnerships, Kiddel II, Ltd. and JTOM II, Ltd.  The ownership structure is unquestionably complex, but the essential finding is that all of the related entities were owned and controlled by Thomas and Kidd.

---

[2] *Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors, LLC v. United States*, 659 F.3d 466, 480 (5th Cir. 2011) (footnote omitted).

## B. The BPP Scheme

The district court found that Thomas and Kidd's accountant, H. Glenn Henderson, introduced them to the concept of BPPs, which were issued by Fidelity Insurance Company and Citadel Insurance Company, both based offshore in the British West Indies. Fidelity and Citadel were associated with several other companies under the umbrella of the Alliance Holding Company, Ltd., including a trust company, an administrative services company, and a marketing firm, Foster & Dunhill. Fidelity and Citadel were not owned by Thomas and Kidd.

The idea behind the BPPs was to set up an offshore "asset protection trust" then purchase cash-value life insurance policies, whose cash values would be invested with the principal and interest allocated to "separate asset" accounts (or "segregated accounts"). The goal was to set aside the assets of these accounts and account for them separately from other insurance policies, shielding them from the owners of other insurance policies and from the creditors of the insurance companies. One of the district court's key findings is that the accounts were invested in accordance with the client's instructions.

Thomas and Kidd purchased cash-value life insurance policies, through their various companies, from Fidelity and/or Citadel beginning in 2002, and in the relevant tax year, 2006, they had policies in place from both Fidelity and Citadel.

The final step was the purchase of a BPP, which ostensibly insured a given business against risks. At the end of the policy year, the profit (approximately 85% of the premium from the BPP, less a management fee) would be placed into the already established separate asset accounts. The district court found that, under the arrangement, each client's account was responsible only for BPP claims filed by that client's business, and no third

party could access the account. Tellingly, each BPP provided coverage only against remote and implausible risks, virtually guaranteeing that no claim could be made under the policy.

Assuming no claim was made under the BPP (nearly guaranteed by the terms of the policy), approximately 85% of the premium was deposited into the segregated accounts as profit, including the cash value of the policy. The life insurance policy holder could then withdraw those funds as a tax-free policy loan. If successful, this plan would allow TKOP to deduct 100% of the insurance premiums from taxable income as reasonable and necessary business expenses, then the life insurance policy holder (ultimately a co-owner of TKOP) could withdraw approximately 85% of that amount as a tax-free loan from the life insurance policy account. The district court found that although the BPPs were *apparently* set up to protect Thomas and Kidd's businesses, in reality the policies were merely a conduit used to funnel income from the businesses to offshore entities in a scheme to avoid paying taxes due on that income. The policy only protected against claims made by one of the closely held entities controlled by Thomas and Kidd.

The district court found that Thomas and Kidd issued investment instructions for the segregated accounts, which were in fact followed. For the year 2006, Thomas and Kidd's businesses paid $4.5 million in premiums on various BPPs, which they deducted as ordinary and necessary business expenses. At the conclusion of the one-year policies, Fidelity and Citadel deducted $730,000 from that total in fees, then transferred the profits of $3.86 million into the various segregated accounts in accordance with Thomas and Kidd's instructions. In this way, the district court found, "$730,000 was spent to acquire a $4.5 million reduction in otherwise taxable income in the United States and to funnel the remaining $3.86 million . . . into offshore life insurance

policies."[3]

Thomas and Kidd withdrew all $3.86 million within one day of the transfer as policy loans.

TKOP does not appeal the findings or conclusion regarding the BPP scheme, and the BPPs are not directly at issue in this appeal. Nevertheless, the segregated accounts and the method of withdrawing the funds as policy loans are central to the royalty interest transaction at issue in this appeal.

## C. Royalty Interest Transaction

The district court found that the BPP scheme was not the only method Thomas and Kidd used to avoid paying taxes. In brief, TKOP carved out royalty interests from its working interests in a number of oil and gas properties and then transferred these royalty interests, through intermediate entities controlled by Thomas and Kidd, into the segregated accounts associated with the Thomas and Kidd life insurance policies. A small portion of the income was intended to flow back as annuity payments purchased with the royalty interests, which payments were deferred for three years and thus not taxable in 2006. The larger portion was held in the segregated accounts and was available at any time for tax-free policy loans.

There were four steps involved in the royalty transaction.

**(1)** In early 2006, Thomas and Kidd created two limited liability companies, one in Nevis which was owned by the same entities that own TKOP; and one in Nevada which was soon owned 100% by the Nevis LLC. The Nevis LLC's role was to act as foreign intermediary.

**(2)** TKOP assigned royalty interests representing approximately 31% of TKOP's total royalty income to the Nevada entity.

**(3)** The Nevada LLC was transferred to the Nevis LLC, giving the Nevis

---

[3] *See* District Court's May 16, 2013 Order Nunc Pro Tunc ("Order"), p. 9.

LLC indirect control of the royalty interests.

**(4)** The Nevis LLC was transferred to the life insurance segregated accounts in exchange for two annuities, one of which would pay $192,810 per year for the remainder of Kidd's life, and the other of which would pay $178,579 per year for the remainder of Thomas's life. These payments were deferred and would not begin until January 2009. Following this exchange, the royalty interests, which represented a future income stream, were held in the life insurance segregated accounts.

The value of the exchanged royalty interest is not clear, though estimates for a one-half interest (for Thomas or Kidd individually) range from $1,001,000 to $1,261,500. Thomas and Kidd's accountant, H. Glenn Henderson, used the higher valuation in the 2006 transaction. He sat on both sides of the transaction, on the one side as Thomas and Kidd's accountant, and on the other side as a manager for the LLCs that owned the life insurance policies. The district court also noted that there was evidence that he was also the investment manager for the segregated accounts which ultimately held the royalty interests.

This complicated transaction did not change anything about TKOP's operation of the underlying oil and gas interests. Following the transfer, approximately 31% of the royalty income which would have been taxable to TKOP before the transfer instead accrued to the life insurance segregated accounts and could be withdrawn as tax-free policy loans. The district court concluded:

> The BPP transaction and the royalty transaction bear similarities. Both transactions accomplish a transfer of assets into cash-value life insurance policies. Both transactions represent an internal shifting of assets from one set of entities owned and controlled by Thomas and Kidd to another set of entities owned and

> controlled by Thomas and Kidd. The tax benefits sought in this case require arm's-length transfers to third parties, but no third parties exist on either end of the BPP or royalty transactions.[4]

The district court also devoted more than five pages of its Order to setting out the numerous problems with the legal and accounting advice TKOP purportedly relied on for the transactions in question, including serious conflicts of interest for Thomas and Kidd's lawyer, Theodore Lustig, and their accountant, H. Glenn Henderson; and several instances of other advisors backing out of their opinions, refusing to issue a subsequent opinion, noting that Thomas and Kidd had misrepresented facts, and similar issues.

As the district court moved on to its conclusions of law, it emphasized what it considered the most essential fact:

> The legal conclusions in this case turn on one fact: John Thomas and Lee Kidd owned and controlled the assets at issue before the transactions and after the transactions. In substance, the BPP premium payments and royalty transfers were distributions from the Thomas and Kidd businesses to Thomas and Kidd and their families. These distributions to themselves do not qualify as tax deductible business expenses or valid transfers of income to third parties.[5]

### III. Law and Analysis

### A. TEFRA Framework and TKOP's Jurisdictional Challenge

This case under 26 U.S.C. § 6226 is governed by the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), 26 U.S.C. §§ 6221–6233.

> Under TEFRA, "the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an

---

[4] *Id.* at p. 12.

[5] *Id.* at p. 18.

adjustment to a partnership item) shall be determined at the partnership level." 26 U.S.C. § 6221. TEFRA specifically sets forth the scope of judicial review:

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates; the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

26 U.S.C. § 6226(f) . . . .[6]

Treasury Regulation section 301.6231(a)(3)–1, 26 C.F.R. § 301.6231(a)(3)–1, provides, "Where the determination of an item has no effect on the partnership, the item is not a partnership item and cannot be decided in a TEFRA proceeding." TKOP argues for the first time on appeal that the district court only had jurisdiction under TEFRA to address the initial distribution of the mineral royalties from TKOP but did not have jurisdiction to address the eventual purchase of the annuities which were used to flow the smaller portion of the money back to Thomas and Kidd because (a) the agreement was irrelevant to all TKOP's partners, and (b) TKOP itself did not participate in those annuities contracts.

TKOP cites *Roberts v. Commissioner*, 94 T.C. 853, 861 (1990), for the proposition that the court has no jurisdiction under TEFRA to address an issue that "would have no effect on any item that would affect all of the partners' respective returns and would have no effect on any item on the

---

[6] *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States,* 568 F.3d 537, 547 (5th Cir. 2009) (emphasis removed).

partnership return or the partnership's books and records." That begs the question. The whole point of the district court's determination was that the private annuity sale was an essential part of the transaction as a whole, in that it was the final step that returned the smaller portion of the money, after a delay, to TKOP's partners after sidestepping TKOP's reported income. The transaction unquestionably affected TKOP's global income and, by extension, the returns of all TKOP's partners.

Determining "partnership items" under TEFRA necessarily requires a holistic approach to examining the classification of potential income items. TKOP cannot isolate just the first part of the transaction—the transfer of the overriding royalties out of TKOP—and ignore the rest of the scheme, all of which was essential to accomplish the goal of reducing or avoiding taxes for TKOP, as the district court found. Thus, we conclude that the district court had jurisdiction under TEFRA to address every part of the royalty interest transaction, and ultimately to disregard the *entire* transaction, including the annuity sale, for tax purposes.[7]

### B. Assignment of Income Doctrine

This case turns on the application of the assignment of income doctrine and the economic substance doctrine. A classic explanation of the assignment of income doctrine is found in *Caruth Corp. v. United States*, 865 F.2d 644 (5th Cir. 1989):

---

[7] TKOP argued at length on appeal that the annuities were legitimate and should not have been disregarded by the district court. What TKOP ignores is that the district court's determination concerned whether the transaction *as a whole* represented an improper assignment of income and lacked economic substance, not whether each particular part might be construed as proper outside of the context of the larger transaction. We agree with the district court that the entire transaction, necessarily including the tax-free annuity purchases, constituted an improper assignment of income and lacked economic substance and therefore should be disregarded for tax purposes.

The assignment of income doctrine holds that one who earns income cannot escape tax upon the income by assigning it to another. "[I]f one, entitled to receive at a future date interest on a bond or compensation for services, makes a grant of it by anticipatory assignment, he realizes taxable income as if he had collected the interest or received the salary and then paid it over." *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 267, 78 S. Ct. 691, 695, 2 L. Ed.2d 743 (1958); *see also Lucas v. Earl*, 281 U.S. 111, 115, 50 S. Ct. 241, 241, 74 L. Ed. 731 (1930); *Helvering v. Horst*, 311 U.S. 112, 120, 61 S. Ct. 144, 148, 85 L. Ed. 75 (1940). Justice Holmes announced the doctrine by a now-famous metaphor: income tax may not be avoided through an "arrangement by which the fruits are attributed to a different tree from that on which they grew." *Lucas v. Earl*, 281 U.S. at 115, 50 S. Ct. at 241.

When a taxpayer gives away earnings derived from an income-producing asset, the crucial question is whether the asset itself, or merely the income from it, has been transferred. If the taxpayer gives away the entire asset, with accrued earnings, the assignment of income doctrine does not apply. *Blair v. Commissioner*, 300 U.S. 5, 14, 57 S. Ct. 330, 334, 81 L. Ed. 465 (1937) (taxpayer's gift conveyed entire interest in income stream, and so did not fall under assignment of income doctrine); *United States v. Georgia R.R. & Banking Co.*, 348 F.2d 278, 285 (5th Cir.1965), *cert. denied*, 382 U.S. 973, 86 S. Ct. 538, 15 L. Ed. 465 (1966). If the taxpayer carves income or a partial interest out of the asset, and retains something for himself, the doctrine applies. *P & G Lake*, 356 U.S. at 265 & n. 5, 78 S. Ct. at 694 & n. 5 (assignment of income doctrine applied because the taxpayer transferred a "short-lived . . . payment right carved out of" a larger interest; "[o]nly a fraction of the oil and sulphur rights were transferred, the balance being retained"). Ultimately, the question is whether the taxpayer himself ever earned income, or whether it was earned instead by the assignee. In terms of Justice Holmes' metaphor,

the question is whether the fruit has been attributed to a different tree, or whether instead the entire tree has been transplanted.[8]

A major question is whether TKOP (or its ultimate owners, Thomas and Kidd) retained beneficial ownership of the overriding royalty interests. For tax purposes, "[t]he true owner of income-producing property . . . is the one with beneficial ownership, rather than mere legal title. It is the ability to command the property, or enjoy its economic benefits, that marks a true owner."[9] "Even assuming their validity under State law, contractual arrangements designed to circumvent this rule, by attempting to deflect income away from the one who earns it, will not be recognized for Federal income tax purposes. Determining who earns the income depends upon which person or entity in fact controls the earning of the income, not who ultimately receives the income."[10]

As the Supreme Court noted in *Commissioner v. Sunnen,* 333 U.S. 591, 604 (1948), the "crucial question [is] whether the assignor retains sufficient power and control over the assigned property or over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes." In *C.M. Thibodaux Co., Ltd. v. United States*, 915 F.2d 992, 995-96 (5th Cir. 1990), we applied *Sunnen* in holding that a corporate taxpayer had made an anticipatory assignment of income when it transferred the right to receive bonuses, delay rentals, and royalties under mineral leases but retained the right to manage the leases. We reasoned that although the transfer qualified as a property transfer under Louisiana law, in substance it was an anticipatory assignment of income under federal income tax law which must be taxed to the corporation.

---

[8] 865 F.2d at 648-49.

[9] *Chu v. Comm'r.*, 72 T.C.M. (CCH) 1519, at \*3 (T.C. 1996) (citation omitted).

[10] *Benningfield v. Comm'r.*, 81 T.C. 408, 418-19 (1983).

No. 13-10799

Here, the district court concluded that the royalty interest transfer was an anticipatory assignment of income under these legal principles based on its primary finding of fact, that Thomas and Kidd owned and controlled the assets at issue before and after the transaction. The district court elaborated:

> The economic relationship between Plaintiffs and Thomas and Kidd was identical at the beginning and the end of the transaction. JTOM II and Kiddel II owned the working interests from which the overriding royalty interests were created. After the transfers from Thomas & Kidd Oil Production through all of the entities, the private annuities were payable to the same entities that owned Thomas & Kidd Oil Production, JTOM II and Kiddel II. The transfer merely removes income from one pocket and puts it into another. The economic benefits of the royalty interests did not change with the alleged assignment, and the transaction should not be allowed to transfer taxable income away from Plaintiffs. . . .
>
> The income from the allegedly transferred royalty interests should be assigned to Thomas & Kidd Oil Production. The transaction involved a variety of alleged transfers among entities owned and controlled by Thomas and Kidd, ending with cash-value life insurance policies also under their control. Once the income was in those life polices, they continued to control how the royalty income was used and invested through the letters of wishes. Thomas admitted that the royalty transaction was done for estate planning purposes and that operation of the properties did not change after assignment of the royalty interests.
>
> The income from the royalty interests should remain with Thomas & Kidd Oil Production and not the alleged transferees, who neither received the benefits

13

of the income nor exercised control over its production.[11]

On appeal, TKOP's primary argument with respect to the assignment of income doctrine is that the district court improperly conflated TKOP and the various other entities in finding that TKOP retained control or benefit from the royalty monies. TKOP argues that it was actually hurt by the overriding royalty interest transfer because it lost that royalty income, which only flowed to other entities controlled by Thomas and Kidd.

While it is true that TKOP lost the royalty income on paper, the district court found that the money ended up with TKOP's owners, bypassing income tax in the process. TKOP cannot slice up the scheme into a series of small parts; the thrust of the applicable law set out above is to look at the big picture. Under the district court's findings of fact, Thomas and Kidd controlled TKOP and every part of the scheme, which is a hallmark of unlawful assignment of income. Thus, this argument is without merit.

Next, TKOP argues that the district court focused on irrelevant information, such as the fact that Thomas and Kidd entered into the transaction for estate planning purposes, that the sale was not arm's length, and that TKOP's operations did not change after the sale. Even if this information is irrelevant, it demonstrates the true character of the transaction.

Next, TKOP argues that the royalty interest transfer was a property transfer under IRS regulations and thus could not be an assignment of income. TKOP ignores *C.M. Thibodaux Co., Ltd. v. United States*, *supra*, in which we held that a purported transfer of a royalty interest may still qualify as an assignment of income when the transferor retains control. The transfer in this case was not a true transfer because the district court found that TKOP (or

---

[11] *See* Order, pp. 26-28.

more precisely, its ultimate owners) retained beneficial ownership of the mineral interests and ultimately received the proceeds after a circuitous route through several intermediaries.

Finally, TKOP argues that the district court clearly erred in finding that Thomas and Kidd retained control of the overriding royalty interests after TKOP's initial transfer to the Nevada LLC. TKOP points to evidence from which the district court could have concluded that the third party insurance companies actually owned and controlled the royalty interests held in the segregated accounts. TKOP has failed to show clear error. The question is not whether the district court *could* have reached the findings asserted by TKOP (i.e., that the insurance company actually controlled the segregated accounts) but whether the district court erred in finding the opposite. The district court rejected TKOP's evidence and gave credence to the Government's evidence when it found that Thomas and Kidd actually controlled the accounts (individually or through their businesses) through letters of wishes regarding how the funds were to be invested and how they were to be distributed as loans. This means that the risk-shifting normally associated with an annuity, in which the annuitant gives up the potential of higher returns in exchange for a guaranteed income stream, did not exist. Thomas and Kidd retained the ability use the funds for high-risk investments and at any time could have withdrawn the entire balance.

In short, the district court issued numerous specific findings of fact set out above in addition to its primary finding that Thomas and Kidd were in control of the entire transaction. We cannot say that the district court clearly erred in making any of its findings. From these facts it follows that the royalty interest transaction is an unlawful assignment of income for the reasons assigned by the district court.

## C. Economic Substance

The district court also concluded that it lacked economic substance.  We explained in *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537 (5th Cir. 2009):

> The economic substance doctrine allows courts to enforce the legislative purpose of the Code by preventing taxpayers from reaping tax benefits from transactions lacking in economic reality. As the Supreme Court has recognized, taxpayers have the right to decrease or avoid taxes by legally permissible means. However, "transactions[] which do not vary control or change the flow of economic benefits[] are to be dismissed from consideration."[12]

Relying on *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978), *Klamath* set out for the first time in this Circuit a "multi-factor test for when a transaction must be honored as legitimate for tax purposes," including

> whether the transaction (1) has economic substance compelled by business or regulatory realities, (2) is imbued with tax-independent considerations, and (3) is not shaped totally by tax-avoidance features. Importantly, these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes. Thus, if a transaction lacks economic substance compelled by business or regulatory realities, the transaction must be disregarded even if the taxpayers profess a genuine business purpose without tax-avoidance motivations.[13]

In *Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors, LLC v. United States*, 659 F.3d 466 (5th Cir. 2011), we elaborated:

---

[12] 568 F.3d at 543 (citations omitted).

[13] *Id.* at 544 (citation omitted).

> As to the first *Klamath* factor, transactions lack objective economic reality if they "'do not vary[,] control[,] or change the flow of economic benefits.'" This is an objective inquiry into whether the transaction either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so. That inquiry must be "conducted from the vantage point of the taxpayer at the time the transactions occurred, rather than with the benefit of hindsight." . . .

> The latter two *Klamath* factors ask whether the transaction was motivated solely by tax-avoidance considerations or was imbued with some genuine business purpose. These factors undertake a subjective inquiry into "'whether the taxpayer was motivated by profit to participate in the transaction.'" Tax-avoidance considerations are not wholly prohibited; taxpayers who act with mixed motives, seeking both tax benefits and profits for their businesses, can satisfy the business-purpose test.[14]

Under the district court's findings of fact, the flow of money from TKOP's mineral interests to TKOP's owners did not change in a meaningful way after the transaction. The money merely took a more circuitous route and bypassed income taxes in the process. The first *Klamath* factor fails because the royalty interest transfer did not effect a change in control, did not ultimately change the flow of economic benefits, and did not cause "real dollars to meaningfully change hands." The failure of that factor alone is sufficient to reach the conclusion that the transaction lacked economic substance. Additionally, based on the district court's findings of fact, the transaction also fails the second and third factors because the transaction had no profit motive, only a tax avoidance motive in connection with estate planning. That would not be

---

[14] 659 F.3d at 481-82 (footnotes omitted).

an improper motive in itself, but it cannot be the *sole* purpose under *Klamath*. Thus, the district court correctly concluded that the transaction lacked economic substance.

TKOP argues that the district court improperly focused on the transaction as a whole (including the ultimate flowback to the Thomas and Kidd-controlled entities) and instead should have focused on the initial transfer of the overriding royalty interests from TKOP. As already noted above, a court must look at the transaction as a whole to determine the economic substance. TKOP's attempt to isolate only the first transaction does not tell the whole story.

TKOP's argument rests on its assumption that the transfers were to independent entities, but the district court found that Thomas and Kidd ultimately controlled every step in the scheme, and the money ended up with Thomas and Kidd and their families. Based on the district court's findings of fact, there appears to be no real profit motive at any stage of the transaction; rather, the transaction overwhelmingly appears to have been entered into for tax avoidance. Thus, for the reasons set out above, we conclude that the district court did not err in concluding that the transaction lacked economic substance.

## IV. Conclusion

For the foregoing reasons, we AFFIRM. The district court properly concluded that the entire royalty interest transaction should be disregarded for tax purposes.