T.C. Memo. 2017-218

UNITED STATES TAX COURT

ROBERT E. SMITH, III AND ANGELA K. SMITH, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21707-15.                          Filed November 6, 2017.

George W. Connelly, Jr., for petitioners.

M. Kathryn Bellis and Yvette Nunez, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  Respondent issued a notice of deficiency determining a

$623,795 income tax deficiency and a $124,759 accuracy-related penalty under

section 6662(a) for petitioners' 2009 tax year.[1]  During 2009 petitioners

_____

[1]Unless otherwise indicated, all Rule references are to the Tax Court Rules

(continued...)

[*2] transferred their personal assets of cash and marketable securities to a wholly owned S corporation, which in turn transferred the assets to a family limited partnership. Petitioners dissolved the S corporation and received the partnership interest in the dissolution of the S corporation. Through this structure and the transfer of their personal assets, petitioners claimed an ordinary loss deduction on the liquidating distribution by using a substantially discounted value for the assets held by the partnership. Petitioners have conceded that to the extent they are entitled to a loss deduction for 2009, it should be characterized as a short-term capital loss.

After concessions the issues for consideration are whether petitioners: (1) are entitled to deduct a short-term capital loss for 2009 relating to the dissolution of the S corporation and (2) are liable for a section 6662(a) accuracy-related penalty for 2009. For the reasons stated herein, we decide both issues for respondent.

---

[1](...continued)
of Practice and Procedure, and all section references are to the Internal Revenue Code (Code) in effect for the year at issue. All amounts are rounded to the nearest dollar.

[*3]                          FINDINGS OF FACT

At the time petitioners timely filed their petition, they resided in Texas.[2] Mr. Smith worked for National Coupling Co., Inc. (National Coupling), for 36 years, retiring in 2009, the year at issue, and owned 3,000 shares of its stock, representing an approximately 0.5828% ownership. National Coupling manufactured pneumatic and hydraulic subsea couplings and valves. Mr. Smith was the company's vice president and the manager at its manufacturing facility. He was in charge of manufacturing, engineering, intellectual property work, and trademarks. Mr. Smith is an inventor with over 400 patents issued or in prosecution at the time of trial. Most of Mr. Smith's inventions relate to subsea hydraulic couplings and pneumatic couplings from his employment with National Coupling. One of his inventions was used to fix the space shuttle rocket boosters after the Challenger disaster. He won a Texas Inventor of the Year Award from the Texas State Bar Association in 2008. Petitioners have been married for over 50 years. Mrs. Smith is a homemaker. Both Mr. and Mrs. Smith graduated from high school and have taken some college courses.

_____

[2]The parties' stipulation of facts with accompanying exhibits is incorporated herein by this reference.

**[*4]**  In June 2009 National Coupling was sold and Mr. Smith retired.  Mr. Smith received a $600,000 bonus, $248,246 from the sale of his stock, and $181,170 from the surrender of two company-sponsored life insurance policies.  In total he received employee compensation, including the bonus, of $664,007 in 2009.  After the sale he began to provide consulting services to National Coupling under a two-year contract and received $37,800 under that contract in 2009.  During his employment at National Coupling Mr. Smith had worked on a sprinkler device for home sprinkler systems that would automatically apply fertilizer or insecticide.  He had worked on the sprinkler device in 2005 or 2006, and a patent application was filed with the U.S. Patent and Trademark Office (USPTO) in 2006.  Patent applications were also filed in Canada and the United Kingdom.  The U.S. patent was issued in 2014, and the Canadian patent was issued in October 2009.  The record does not establish the date of the U.K. patent.  Documents relating to the sale of National Coupling did not grant Mr. Smith the right to the sprinkler device patent.  However, Mr. Smith believed that he would retain the patent rights to the sprinkler device after the sale.

**[*5]** I.  Tax Strategy

As a result of the National Coupling sale and Mr. Smith's retirement, petitioners' financial adviser recommended that they obtain estate planning advice and referred them to Richard Shanks of the Shanks Law Firm (Shanks Firm), now known as Shanks & Hauser. The financial adviser had referred other clients to Mr. Shanks, an experienced attorney and a certified public accountant. He has an undergraduate accounting degree from the University of Texas and a law degree from the University of Texas Law School. His practice focuses on estate planning, probate, tax planning, and tax return preparation, and he works mostly with entrepreneurs and executives. Petitioners met with Mr. Shanks on June 23, 2009. He prepared various estate planning documents for them, including wills and medical directives. Mr. Shanks also recommended a tax planning strategy intended to mitigate the effect on petitioners' tax liability of Mr. Smith's compensation from National Coupling. The tax structure involved the organization of an S corporation and the formation of a family limited partnership. Under the structure, petitioners would transfer their cash and marketable securities to a wholly owned S corporation that would then transfer the assets to a family limited partnership. Mr. Shanks explained to petitioners that the family limited partnership would provide asset protection. The S corporation would own the

[*6] limited partnership, and the partnership would hold petitioners' cash and marketable securities. As part of the structure, petitioners would organize and dissolve the S corporation within the same tax year. The S corporation would distribute the partnership interest to the shareholders upon dissolution. Mr. Shanks would determine the fair market value of the distributed partnership interest using large discounts for lack of marketability and lack of control, generating a tax loss upon the dissolution of the S corporation. The S corporation's dissolution and the distribution of the partnership interest were both necessary to generate the tax loss. A third entity in the planning structure was a revocable management trust that would hold the general partnership interest. Mr. Shanks advised that the tax structure could generate either a capital or an ordinary loss deduction on the basis of the business purpose of the S corporation. He had implemented similar structures for 10 to 15 other clients between 1999 and 2009.

On July 9, 2009, petitioners organized RACR Ventures, Inc. (Ventures), an S corporation, formed RACR Partnership, Ltd. (RACR Partnership), a family limited partnership, and created the Smith Management Trust (Smith Trust), a revocable management trust (collectively, RACR structure). Petitioners each owned 50% of Ventures. Mr. Smith was its president and treasurer, and Mrs.

**[\*7]** Smith was the vice president and secretary. Both were directors. Ventures owned a 98% limited partnership interest in RACR Partnership. Initially each petitioner was a 1% general partner. Petitioners transferred their general partnership interests to the Smith Trust. Petitioners were cotrustees and beneficiaries of the Smith Trust. From the outset petitioners understood that Ventures would not hold any assets, Ventures would immediately transfer its assets to RACR Partnership, and they would dissolve Ventures by the end of 2009 to accomplish their tax mitigation plan. Petitioners understood that Ventures was the vehicle they would use to minimize their 2009 income tax liability. Petitioners' handwritten notes from their meeting with Mr. Shanks in June 2009 identified the RACR structure as a vehicle to minimize tax for 2009. Email communications between petitioners and the Shanks Firm in July and August 2009 acknowledge a "liquidation" in 2009, Ventures "goes away" in 2009, and they "will form a new corp next year".

II.    Transfer of Assets

On August 3, 2009, petitioners made a series of transfers of cash and marketable securities from three personal accounts at Merrill Lynch to three newly opened accounts of Ventures at Merrill Lynch (Ventures accounts) and then to

[*8] three newly opened accounts of RACR Partnership at Merrill Lynch (RACR Partnership accounts) as follows:

| Account No. | Cash | Securities |
|---|---|---|
| 1 | $804,911 | $362,095 |
| 2 | 65,069 | 513,557 |
| 3 | 766 | 70,554 |
| Total | 870,746 | 946,206 |

Petitioners transferred a total of $1,816,952 in cash and marketable securities to RACR Partnership via Ventures in the above transfers. On August 5, 2009, petitioners made additional nominal cash transfers to two Ventures accounts, and Ventures in turn transferred the cash to two RACR Partnership accounts the next day. By August 5, 2009, most of petitioners' assets were held by RACR Partnership. Subsequently the RACR Partnership transferred a nominal amount of cash to Ventures to pay account fees. On August 31 and November 18, 2009, petitioners transferred additional nominal amounts of cash from their personal account at Merrill Lynch to a Ventures account and then to an RACR Partnership account at Merrill Lynch. As of the end of August, September, October, and November 2009, Ventures' three accounts had zero balances.

[*9] On August 12, 2009, RACR Partnership distributed $100,000 to petitioners to purchase long-term care insurance that Mr. Shanks had recommended as part of their estate planning. Mrs. Smith recorded the $100,000 as a loan to petitioners, but Mr. Shanks treated the transfer as a distribution. In August 2009 RACR Partnership also extended a line of credit to petitioners for $500,000. Mr. Shanks suggested the line of credit as a means for petitioners to have access to RACR Partnership's assets to pay their living expenses if necessary. Petitioners signed a line of credit note on August 9, 2009, payable to RACR Partnership with a $500,000 principal and a 2.8% interest rate payable at maturity on July 31, 2018. Petitioners did not withdraw any money from the line of credit and ultimately canceled it in 2014.

In August 2009 petitioners opened accounts in the names of Ventures and RACR Partnership at Morgan Stanley Smith Barney (Smith Barney) and authorized the transfer of assets held in a personal account at Smith Barney to Ventures and authorized the transfer of those assets from Ventures to RACR Partnership. On November 3, 2009, petitioners transferred $57,037 in securities from a personal account at Smith Barney to a newly opened account for Ventures at Smith Barney. The next day Ventures transferred the securities to a newly opened account for RACR Partnership at Smith Barney. Smith Barney recorded

**[*10]** the transfers in journal entries as effective September 30, 2009. After the transfer petitioners' and Ventures' Smith Barney accounts had zero balances. On November 18, 2009, petitioners transferred nominal amounts of cash from two personal accounts at Merrill Lynch to two Ventures accounts at Merrill Lynch, and Ventures transferred the cash to two RACR Partnership accounts at Merrill Lynch the next day. During 2009 petitioners transferred a total of $1,881,737 in cash and marketable securities to Ventures, and Ventures transferred a net amount of $1,881,467 to RACR Partnership. Petitioners transferred a net amount of $1,781,467 to RACR Partnership via Ventures, taking into account the $100,000 distribution from RACR Partnership to them for the long-term care insurance. Ventures did not have any business activities during 2009. It did not have a bank account, did not issue stock certificates, did not keep minutes of meetings, and did not follow corporate formalities.

III.     Dissolution of Ventures

On November 18, 2009, petitioners met with Mr. Shanks and began to dissolve Ventures, effective December 31, 2009. On December 10, 2009, petitioners filed required documents with the Texas secretary of state to end Ventures' corporate existence, indicating that they had organized Ventures to pursue business opportunities and were dissolving the corporation to reduce

**[*11]** overhead expenses because they had not found any profitable opportunities. The Shanks Firm prepared the legal documents required to dissolve Ventures. In the dissolution Ventures transferred a 49% limited partnership interest in RACR Partnership to each petitioner, effective December 10, 2009. Petitioners transferred 1% limited partnership interests to two trusts in the names of each of their two sons (children's trusts), effective December 31, 2009. As of the end of 2009 RACR Partnership was owned as follows: the Smith Trust owned a 2% general partnership interest, petitioners each owned a 48% limited partnership interest, and the children's trusts owned 1% limited partnership interests.

IV.     Legal Fees

Mr. Shanks generally charged a flat fee for his legal services. He charged petitioners a flat fee of $23,200 for services relating to their will and relevant estate planning documents and the RACR structure. Petitioners paid the fee in two installments of $10,000 and $13,200 at the initial meeting on June 23, 2009, and on July 9, 2009, respectively. Mr. Shanks did not charge petitioners an additional fee for Ventures' dissolution in November 2009. He submitted an invoice dated January 2, 2010, to petitioners for legal services relating to Ventures' dissolution showing a fee of zero.

**[\*12]** V.  <u>Tax Returns and Reporting Position</u>

The Shanks Firm prepared the 2009 returns for petitioners, Ventures, and RACR Partnership for $3,050.  In August 2009 Mrs. Smith met with petitioners' former accountant and return preparer.  She provided relevant documents relating to the RACR structure to the accountant.  After meeting with the former accountant, Mrs. Smith asked Mr. Shanks to answer the accountant's questions concerning the RACR structure.  Petitioners understood that their former accountant did not feel comfortable preparing the necessary returns for the RACR structure.  Petitioners did not consult any other tax professionals regarding the RACR structure or their 2009 income tax.

Ventures filed an initial and final corporate tax return for 2009.  Ventures reported gross receipts of $1,120,675 and cost of goods sold of $1,870,527, resulting in an ordinary loss of $749,852.  It reported the values of the 49% limited partnership interests in RACR Partnership distributed to petitioners as gross receipts.  To calculate the values of the distributed partnership interests, the Shanks Firm used the cash and the value of the securities that petitioners had transferred to RACR Partnership via Ventures and applied a 40% discount for lack of marketability and lack of control.  Mr. Shanks used a 40% discount on the basis

[*13] of his research of discounts allowed in reported court opinions. Ventures'

reported gross receipts for 2009 were calculated as follows:[3]

| Item | Amount |
|---|---|
| Cash and marketable securities | $1,805,090 |
| Note payable | $100,000 |
| Total assets | $1,905,090 |
| 98% of total assets | $1,867,791 |
| Adjustment for 40% discount for partnership interests | 60% |
| Gross receipts | $1,120,675 |

To calculate cost of goods sold of $1,870,527, the Shanks Firm used

petitioners' alleged bases in the cash and marketable securities that they had

transferred to Ventures and then to RACR Partnership. Mr. Shanks intended that

the cost of goods sold would equal petitioners' bases in Ventures. The parties

have stipulated that petitioners had a total basis of $1,833,558 in Ventures. Mr.

Shanks had Ventures report the values of the distributed partnership interests as

gross receipts and report petitioners' alleged total basis in Ventures as the cost of

goods sold because the RACR tax strategy was intended to produce an ordinary

---

[3]We note that the value of a 98% partnership interest would be $1,866,988 using the above amounts, and a 40% discount would result in gross receipts of $1,120,193.

[*14] loss to offset Mr. Smith's compensation from National Coupling. Petitioners reported the loss on the distribution of the RACR Partnership interests as an ordinary loss. Ventures did not have any gross receipts for 2009 or any cost of goods sold. Ventures reported property distributions of $1,115,479, including $1,120,675 in gross receipts less certain deductions.

On two separate forms filed with the Internal Revenue Service (IRS) Ventures' business activity was reported as trading or management. On its 2009 return RACR Partnership's business activity was reported as investment. RACR Partnership's 2009 return did not report any gross receipts, sales, deductions, or business income or loss. RACR Partnership reported nominal amounts of interest income, dividends, and net short-term and long-term capital gains that passed through to Ventures.

On their 2009 joint return petitioners reported income of $849,422 from National Coupling, including $664,007 in compensation, $37,800 in consulting fees, and $181,170 in capital gain from two company-sponsored life insurance policies. Petitioners have conceded that the $181,170 received upon the surrender of the two life insurance policies was ordinary income. Petitioners claimed an ordinary loss deduction of $749,852 from Ventures. In the notice of deficiency respondent disallowed the $1,870,527 adjustment for cost of goods sold from

[*15] Ventures as reported on petitioners' joint return and increased petitioners' ordinary income by the reported gross receipts of $1,120,675 and, in the alternative, determined that Ventures had gross receipts of zero, resulting in a disallowance of petitioners' claimed ordinary loss deduction. Respondent advanced the alternative argument at trial.

## OPINION

Respondent contends that petitioners are not entitled to deduct the 2009 loss upon the dissolution of Ventures because the RACR structure lacked economic substance, or in the alternative, the loss deduction did not meet the section 165 requirements for a bona fide loss incurred in a trade or business or a transaction entered into for profit. He further argues that if petitioners are entitled to the 2009 loss deduction, they understated the fair market value of the partnership interests distributed by Ventures. Each party presented expert testimony on the fair market value of RACR Partnership upon Ventures' dissolution. We find that the RACR structure lacked economic substance and accordingly do not address respondent's two alternative arguments.

I.      Economic Substance Doctrine

Taxpayers generally are free to structure their business transactions as they wish even if motivated in part by a desire to reduce taxes. Gregory v. Helvering,

**[\*16]** 293 U.S. 465, 469 (1935).  The economic substance doctrine, however, permits a court to disregard a transaction--even one that formally complies with the Code--for Federal income tax purposes if it has no effect other than generating an income tax loss.  See Knetsch v. United States, 364 U.S. 361 (1960).  Whether a transaction has economic substance is a factual determination.  United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 456 (1950).  The taxpayer bears the burden of proving that a transaction has economic substance.  Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1355-1356 & n.15 (Fed. Cir. 2006).

An appeal in this case would lie to the Court of Appeals for the Fifth Circuit.  Accordingly, we follow the law of that circuit with respect to its interpretation of the economic substance doctrine.  See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).  The Court of Appeals for the Fifth Circuit has interpreted the economic substance doctrine as a conjunctive "multi-factor test".  Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States, 568 F.3d 537, 544 (5th Cir. 2009).  In Klamath, the Court of Appeals stated that a transaction will be respected for tax purposes only if:  (1) it has economic substance compelled by business or regulatory realities, (2) it is imbued with tax-independent considerations, and (3) it is not shaped totally by tax-avoidance features.  Thus, a transaction must exhibit an objective

[*17] economic reality, a subjectively genuine business purpose, and some motivation other than tax avoidance. Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors LLC v. United States, 659 F.3d 466, 480 (5th Cir. 2011). Failure to meet any one of these three factors renders the transaction void for tax purposes. Klamath, 568 F.3d at 544. While Klamath phrases the economic substance doctrine as a conjunctive, three-factor test, the Court of Appeals for the Fifth Circuit has recognized that "there is near-total overlap between the latter two factors. To say that a transaction is shaped totally by tax-avoidance features is, in essence, to say that the transaction is imbued solely with tax-dependent considerations." Southgate Master Fund, 659 F.3d at 480 & n.40.

Petitioners claim that they organized Ventures as part of the RACR structure to manufacture and sell the sprinkler device after Mr. Smith received the patent. They claim that they transferred their personal assets to Ventures to finance the start of this new business enterprise. Ventures immediately transferred the assets to RACR Partnership purportedly for asset protection purposes, but, according to petitioners, the funds would have been available to Ventures once it started to manufacture the sprinkler device. According to petitioners, they dissolved Ventures four months later because of unforeseeable circumstances: (1) the patent had not been issued and (2) Mr. Smith was busy with his consulting

[*18] work.  We find that petitioners' claims with respect to their purpose for organizing and dissolving Ventures in 2009 are not credible.  Ventures and the RACR structure fail to meet all three prongs of the economic substance doctrine as set forth by the Court of Appeals for the Fifth Circuit.

A.      Objective Economic Reality Inquiry

For purposes of the objective economic inquiry, a transaction lacks economic substance if it does not "vary$_{[,]}$ control$_{[,]}$ or change the flow of economic benefits."  Id. at 481 (quoting Klamath, 568 F.3d at 543).  The objective economic inquiry asks whether the transaction affected the taxpayer's financial position in any way, i.e., whether the transaction "either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so."  Id. at 481 & n.41.  A circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes.  Merryman v. Commissioner, 873 F.2d 879, 882 (5th Cir. 1989), aff'g T.C. Memo. 1988-72.

The RACR structure failed to alter petitioners' economic position in any way that affected objective economic reality.  The RACR structure was a circular flow of funds among related entities used to generate an artificial tax loss to offset petitioners' 2009 income.  Petitioners transferred a substantial portion of their personal assets to a wholly owned S corporation, Ventures, which in turn

[*19] transferred the assets to RACR Partnership in exchange for a 98% partnership interest. In accordance with petitioners' prearranged tax scheme, Ventures dissolved and distributed a 49% partnership interest to each petitioner. Petitioners controlled RACR Partnership. It held only their personal assets, and they received those assets back in the liquidating distribution of the partnership interest. They generated a loss by valuing the combined 98% distributed partnership interests using a substantial discount for a lack of control and a lack of marketability. They had constant control over the assets. While the form of ownership of the cash and securities changed, the substance did not. The RACR structure and the dissolution of Ventures did not affect petitioners' financial position and did not cause real dollars to meaningfully change hands. Moreover, petitioners understood from the time they implemented the RACR structure that they would not lose control over their personal assets. Petitioners intended from the beginning to dissolve Ventures by the end of 2009 and, as discussed below, never intended that it would manufacture the sprinkler device. Accordingly, we find that the RACR structure and Ventures' dissolution lacked objective economic reality and failed to satisfy the first prong of the economic substance doctrine as set forth by the Court of Appeals for the Fifth Circuit. Failure to satisfy any one prong of the multifactor test established by the Court of Appeals causes the

[*20] transaction to lack economic substance. Nevertheless, we will address the remaining two factors of the economic substance doctrine as interpreted by the Court of Appeals for the Fifth Circuit.

B.     Subjective Purpose Inquiry

The second and third Klamath factors, while enumerated separately, overlap and derive from an inquiry into the taxpayer's purpose--whether the taxpayer had a subjectively genuine business purpose or some motivation other than tax avoidance. Southgate Master Fund, 659 F.3d at 481. Accordingly we address the two factors together. Taxpayers are not prohibited from seeking tax benefits in conjunction with seeking profits for their businesses. Id. Taxpayers who act with mixed motives of profits and tax benefits can satisfy the subjective test. Id. at 481-482. However, for the subjective purpose inquiry, tax-avoidance considerations cannot be the taxpayer's sole purpose for entering into a transaction. Salty Brine I, Ltd. v. United States, 761 F.3d 484, 495 (5th Cir. 2014). The fact that a taxpayer enters into a transaction primarily to obtain tax benefits does not necessarily invalidate the transaction under the subjective purpose inquiry. Compaq Comput. Corp. & Subs. v. Commissioner, 277 F.3d 778, 786 (5th Cir. 2001), rev'g 113 T.C. 214 (1999).

[*21] Petitioners claim that they organized Ventures to manufacture the sprinkler device but changed their minds because the patent had not been issued by the end of 2009 and Mr. Smith was busy with his consulting work. The record is not clear as to whether Mr. Smith owned a right to the sprinkler device patent.[4] Even if we assume that Mr. Smith had the right to the sprinkler device patent, we do not find petitioners' claims that they organized Ventures to manufacture the sprinkler device to be credible. First, Mr. Smith's testimony relating to the Canadian and U.S. patents conflicts with the record. He testified the Canadian patent was issued before the National Coupling sale, but documents in the record show that it was issued in October 2009. Mr. Smith also testified that on the basis of his experience he expected that the USPTO would issue the sprinkler device patent shortly after the Canadian patent's issuance. Thus, according to his testimony he should have expected the U.S. patent to be issued shortly after October 2009. However, petitioners began to dissolve Ventures only one month later. Mr. Smith is an experienced businessman familiar with patent procedure. The U.S. patent application was submitted in 2006. By the end of 2009 he had already waited three years for the patent. In the light of these inconsistencies, we do not find Mr.

---

[4]Petitioners assert that Mr. Smith was to receive the patent rights in the National Coupling sale but did not because of an oversight by the attorneys involved in the sale. Petitioners allege that this mistake was corrected in 2010.

[*22] Smith's testimony that he intended to manufacture the sprinkler device through Ventures to be credible. Nor do we believe that petitioners decided to dissolve Ventures because the USPTO had not issued the sprinkler device patent by November 2009. Rather, we find that petitioners never intended to operate Ventures as a manufacturing business. They intended from the beginning of the RACR structure to organize and dissolve Ventures within the same year to generate a tax loss to minimize their 2009 income tax liability.

Documents in the record establish that it was petitioners' intent when they implemented the RACR structure to organize and dissolve Ventures within the same year. These documents include handwritten notes from their initial meeting with Mr. Shanks that refer to an S corporation as the "vehicle to minimize tax event this year" and statements made in August 2009 that Ventures "goes away" in 2009 and they "will form a new corp next year". Additional inconsistencies in the record include the identification of Venture's activity on IRS forms as trading and management and not the alleged purpose of manufacturing, a reference by an employee of the Shanks Firm to a "liquidation" in July 2009 when asked about the preparation of the 2009 tax returns, and Mr. Smith's testimony stating an incorrect date for when the Canadian patent was issued. Petitioners tried to explain away each of these inconsistencies, but we do not find their explanations credible. The

[*23] record establishes that petitioners had a prearranged plan to organize and dissolve Ventures within the same year to achieve their tax-avoidance strategy. Petitioners did not have a genuine business purpose for Ventures or the RACR structure. They organized Ventures and implemented the RACR structure solely for tax-motivated reasons.

Irrespective of whether Mr. Smith owned the patent rights, we do not believe that Ventures was organized to manufacture the sprinkler device. Ventures existed for only four months and did not conduct any business activities. It did not have any assets, offices, facilities, employees, or expenses. It did not hold any funds to use for business operations because it transferred petitioners' cash and marketable securities to RACR Partnership on the same day or within one day of the initial transfers to it. The Ventures accounts had zero balances as of the end of August through November 2009. Ventures did not follow corporate formalities. Petitioners used the RACR structure to transfer their personal assets to RACR Partnership and added Ventures as a conduit for the sole purpose of creating an artificial tax loss by claiming a substantial discount on the value of their personal cash and securities by holding the assets through a partnership.

Petitioners claim that they did not discuss the tax consequences of the RACR structure or the dissolution of Ventures with Mr. Shanks and did not learn

[*24] about the loss until the 2009 returns had been prepared. They contend that they did not discuss the tax consequences when they implemented the RACR structure in June 2009. They also claim that they did not discuss the tax impact of dissolving and liquidating Ventures when they made the decision to liquidate in November 2009. We find that these claims are not credible and contradict the record. Petitioners' handwritten notes from their initial meeting with Mr. Shanks referred to an S corporation as a tax-mitigation device. An email from an employee of the Shanks Firm dated July 25, 2009, refers to a liquidation. In an email dated August 5, 2009, Mrs. Smith stated Ventures "goes away after 2009. Will there be another corporation beginning in 2010?", and Mr. Shanks responded in an email dated August 6, 2009: "We will form a new corp next year." These emails show that Mrs. Smith knew that Ventures' dissolution was part of the RACR structure from the beginning and they had not changed their minds. Petitioners' attempts to explain these inconsistencies are without merit. The $23,200 flat fee for the RACR structure included a fee for Mr. Shanks' services to dissolve Ventures. Petitioners paid the entire fee when they retained Mr. Shanks and he implemented the RACR strategy. Mr. Shanks did not charge an additional fee to dissolve Ventures and submitted an invoice to petitioners showing a fee of zero. Mr. Shanks had other clients organize and dissolve S corporations within

[*25] the same year to achieve tax benefits, although he sought to blame the S corporations' dissolutions on the 2009 economy.

Petitioners knew from the outset that Ventures would not operate a manufacturing business. They never intended to manufacture the sprinkler device through Ventures. They planned from the beginning to dissolve Ventures before the end of 2009 to create an artificial tax loss to offset their 2009 income tax. They also knew despite their arguments to the contrary that the RACR structure would generate a loss. Mr. Shanks designed the tax structure to include the application of a substantial discount on the value of petitioners' personal assets used in the strategy, and thereby the structure would produce a loss even if the marketable securities increased in value during Ventures' short existence. Petitioners could have accomplished their alleged estate planning goal of asset protection through the limited partnership framework without first transferring their personal assets to Ventures. Ventures was organized for the sole purpose of tax avoidance. Accordingly, we find that Ventures lacked economic substance, and petitioners are not entitled to deduct any loss for 2009 relating to Ventures or the RACR structure.

**[\*26] II.     Section 6662(a) Accuracy-Related Penalty**

Respondent determined that petitioners are liable for a section 6662(a) accuracy-related penalty for 2009. Section 6662(a) and (b)(1) and (2) imposes a penalty equal to 20% of the amount of any underpayment of tax that is attributable to (1) negligence or disregard of rules or regulations or (2) a substantial understatement of income tax. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, and "disregard" includes any careless, reckless, or intentional disregard of rules and regulations. Sec. 6662(c). For individual taxpayers, an understatement is substantial if it exceeds the greater of 10% of the amount of tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). By claiming the ordinary loss deduction on the liquidating distribution of RACR Partnership interests, petitioners understated the tax required to be shown on their 2009 joint return by more than 10%, which was more than $5,000.[5] Accordingly, they are liable for the section 6662(a) penalty

---

[5]Respondent has conceded any accuracy-related penalty with respect to the portion of petitioners' underpayment attributable to the mischaracterization of the proceeds from the two life insurance policies as capital gain because National Coupling incorrectly reported the life insurance proceeds as capital gain on petitioners' Schedule K-1, Shareholder's Share of Income, Deductions, Credits, etc.

**[\*27]** with respect to this portion of the underpayment unless they establish a defense of reasonable cause.

Section 6664(c)(1) provides an exception to the section 6662(a) penalty where the taxpayers demonstrate that they acted with reasonable cause and in good faith with respect to the underpayment. We determine whether a taxpayer acted with reasonable cause and in good faith on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Once the Commissioner presents a prima facie case that a penalty should apply, the taxpayers have the burden to prove that they acted with reasonable cause and in good faith. Higbee v. Commissioner, 116 T.C. 438, 446-449 (2001). A taxpayer's reliance on the advice of a tax professional may constitute reasonable cause and good faith. United States v. Boyle, 469 U.S. 241, 250 (1985). The advice must be based on all pertinent facts and circumstances and the law as it relates to those facts and circumstances and must not be based on any unreasonable factual or legal assumptions. Sec. 1.6664-4(c)(1), Income Tax Regs. We have summarized the requirements of reasonable reliance on professional advice as follows: (1) the taxpayer reasonably believed that the professional was a competent tax adviser with sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer

[*28] actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). A taxpayer's education and business experience are relevant to the determination of whether the taxpayer acted with reasonable reliance on an adviser and in good faith. Sec. 1.6664-4(c)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability. Id. para. (b). Due care does not require that the taxpayer challenge his or her attorney's advice or independently investigate its propriety. Streber v. Commissioner, 138 F.3d 216, 219 (5th Cir. 1998), rev'g T.C. Memo. 1995-601.

The question of whether petitioners' reliance on Mr. Shanks was reasonable is a difficult one. Petitioners went to Mr. Shanks upon the recommendation of their financial adviser for estate planning advice because Mr. Smith was retiring. Mr. Shanks was a qualified attorney and a competent adviser and had the necessary and accurate information to provide his tax advice. Up to this point petitioners' reliance on Mr. Shanks was reasonable. However, we have found that petitioners never intended to conduct any business activities through Ventures. They understood, early in the process, that Ventures would be organized and dissolved in 2009 but continued to represent, even at trial, that Ventures had a business purpose. This is not acting in good faith. They knew from the beginning

[*29] that Ventures would not last past 2009, it did not have a genuine business purpose, and its sole purpose was tax avoidance. That knowledge alone negates a reliance defense.

Petitioners knew that the purpose of the RACR structure was to minimize their 2009 income tax. Their handwritten notes from their first meeting with Mr. Shanks referred to an S corporation as the vehicle to minimize the tax event in 2009. Mrs. Smith emailed the Shanks Firm in August 2009 and sought to confirm that Ventures would dissolve by the end of 2009. Petitioners knew from the time they implemented the RACR structure that Ventures' sole purpose was to avoid income tax on Mr. Smith's bonus from the National Coupling sale. They knew that Ventures would never manufacture the sprinkler device. Even if Mr. Smith owned the patent rights as he claims, petitioners had no intent to keep Ventures in existence until the patent was issued but dissolved it after only four months. Yet they continued to perpetuate their tax-avoidance scheme through their testimony at trial that we have found not to be credible or reliable. Nor do we find credible petitioners' attempts to explain away multiple inconsistencies in the record. Petitioners did not act with reasonable reliance on a professional or act in good faith. Accordingly, we find that petitioners are liable for the section 6662(a) penalty.

**[\*30]** In reaching our holding, we have considered all arguments made, and, to the extent not mentioned above, we conclude that they are moot, irrelevant, or without merit.

<u>Decision will be entered under</u>

<u>Rule 155</u>.