T.C. Memo. 2020-126

UNITED STATES TAX COURT

SEAN L. DAICHMAN AND LINDA E. DAICHMAN, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14368-15.                    Filed August 31, 2020.

<u>George W. Connelly, Jr.</u>, <u>Renesha N. Fountain</u>, and <u>James P. Sheets</u>, for
petitioners.

<u>M. Kathryn Bellis</u> and <u>Yvette Nunez</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Respondent determined a deficiency of $1,163,751 in
petitioners' 2009 Federal income tax, along with a section 6662(a)[1] accuracy-

_____

[1]Unless otherwise indicated, all section references are to the Internal
(continued...)

**[\*2]** related penalty of $231,990.20. During 2009 petitioners transferred personal assets of cash and marketable securities to a wholly owned S corporation, which in turn immediately transferred those assets to a family limited partnership. A few weeks later, petitioners dissolved the S corporation and received the partnership interest as a liquidating distribution. In connection with the liquidation, petitioners claimed a nonpassive loss deduction on Schedule E, Supplemental Income and Loss. The claimed nonpassive loss deduction reflected a substantially discounted value for the partnership interest versus the value of the underlying assets recently transferred to the partnership.[2]

After concessions, the issues for consideration are whether petitioners are (1) entitled to a short-term capital loss deduction of $2,099,090 in connection with the dissolution of their S corporation and (2) liable for the accuracy-related penalty.

---

[1](...continued)
Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioners have conceded that, to the extent that they are entitled to a loss deduction for 2009, that deduction should be characterized as a short-term capital loss, and not as an ordinary loss. The parties have also stipulated that there are no receipts or cost of goods sold as previously reported on the underlying transactions and adjusted in the notice of deficiency.

**[*3]** Petitioners bear the burden of proof.[3]

## FINDINGS OF FACT

I.    Background

Petitioners, husband and wife, resided in Texas at the time the petition was filed.  Mrs. Daichman holds a bachelor's degree in psychology and does not work outside the home.  Mr. Daichman holds a bachelor's degree in engineering from Rice University and a master's degree from Harvard University.  He has previously worked for a chemical company, an oil company, an oilfield services company, an investment management company, and a power plant equipment company.  During 2009 he was employed as vice president of BTEC Turbines LP (BTEC LP).

BTEC LP is a limited partnership formed under Delaware law and registered in Texas as a foreign limited partnership.  It is an operating company that buys old power plant equipment, then refurbishes or relocates it domestically or internationally.  Before the transactions at issue, Mr. Daichman owned 116 A units and 1,166 C units in BTEC LP.  Its general partner during 2009 was BTEC

---

[3]Petitioners have not raised the issue of sec. 7491(a), which shifts the burden of proof to the Commissioner in certain situations.  The Court concludes that sec. 7491(a) does not apply here because petitioners have not produced evidence that they have satisfied the preconditions for its application.  See Rule 142(a).

[*4] LLC, a limited liability company formed under Delaware law. During 2009 Mr. Daichman was vice president of BTEC LLC.

In 2009 Mr. Daichman received salary and wages from BTEC LP of $699,373 and reported nonpassive partnership income of $1,400,136 from BTEC LP.

II.    Tax Strategy

A.    Formation of Entities

On the recommendation of their investment broker, petitioners sought estate planning advice in 2009 from Richard Shanks, an attorney and certified public accountant of the Shanks Law Firm in Houston. Petitioners initially met with Mr. Shanks in April 2009, and, pursuant to that meeting, Mr. Shanks prepared wills, medical and financial powers of attorney, medical directives, and related documents on behalf of petitioners.

In November 2009 petitioners and Mr. Shanks decided upon a tax-planning strategy designed with a goal of eliminating income tax liability on the substantial income that Mr. Daichman was slated to receive that year. The tax structure, which Mr. Shanks marketed to a number of his clients, involved organizing multiple new entities owned or controlled by petitioners to include an S corporation, a family limited partnership, and a family management trust. Under

[*5] the structure, petitioners would contribute cash and marketable securities to the S corporation. The S corporation, once funded, would then transfer those same assets to the limited partnership in exchange for 98% ownership as a limited partner. The family management trust would be the general partner and hold the remaining 2% of the partnership interest. Under Mr. Shanks' proposed tax strategy, petitioners would then dissolve the S corporation and distribute the limited partnership interest to its shareholders, petitioners. Upon the dissolution of the S corporation, at the end of the year petitioners would own the 98% interest in the limited partnership and the partnership would own the assets that petitioners had contributed to the S corporation. Mr. Shanks' proposal suggested that the structure would offer asset protection and that the value of the distributed partnership interests for tax purposes would reflect a reduced value because of large discounts for lack of marketability and control. The structure and the dissolution of the S corporation would generate a tax loss for petitioners to report on their individual return.

Petitioners executed an engagement letter describing the entities, and Mr. Shanks prepared and filed documents on behalf of petitioners to implement the tax strategy. On November 23, 2009, petitioners organized Sean Daichman LLC (Daichman LLC), a Texas limited liability company; Standish Trading, Inc.

**[*6]** (Trading S Corp), a Texas for-profit corporation that elected treatment as an

S corporation pursuant to section 1362; Standish Investments, Ltd. (Investment

LP), a Texas limited partnership; and the Daichman Management Trust (Daichman

Trust), of which petitioners were cotrustees and their three sons were

beneficiaries.[4] Mr. Daichman was the sole member of Daichman LLC. Petitioners

each owned 50% of Trading S Corp, with Mr. Daichman as its president and Mrs.

Daichman as its secretary. Initially, each petitioner held a 1% general partnership

interest in Investment LP, and Trading S Corp held a 98% limited partnership

interest.[5] Petitioners transferred their general partnership interests in Investment

LP to the Daichman Trust. As cotrustees of the Daichman Trust, petitioners were

general partners of Investment LP.

---

[4]The Court will refer to these entities, collectively, as the Standish entities.

[5]The parties have stipulated that, initially, each petitioner held a 49% limited partnership interest in Investment LP. This stipulation is inconsistent with the formation documents for Investment LP, which indicate that Trading S Corp was the sole limited partner at the partnership's formation. Whether Trading S Corp acquired the limited partnership interest through purchase from petitioners or directly from the partnership on its formation does not alter the Court's analysis in this case.

[*7]   B.   Asset Transfers

Following the formation of the entities, petitioners transferred Mr. Daichman's 1,282 BTEC LP units to Daichman LLC. Through multiple transactions on November 25 and December 1, 2009, petitioners also transferred cash and marketable securities totaling $1,750,618 from personal accounts to newly opened accounts of Trading S Corp.

Three days later, on December 4, Trading S Corp transferred $1,650,465 of those same assets to newly opened accounts of Investment LP. Following the December 4 transfers, Trading S Corp was left with approximately $100,000 in cash and marketable securities.

C.   Trading Activity

Mr. Daichman described his personal investing before November 2009 as small and not involving significant amounts of trading experience. He had done little to no research into the requirements of day trading, and his claimed motivation to begin day trading was his observations of others who appeared successful, including his current BTEC business partner, who was also a client of

**[*8]** Mr. Shanks.[6] Mr. Daichman did not do any additional research regarding day trading requirements after he engaged Mr. Shanks to form Trading S Corp.

After formation on November 23, 2009, and subsequent funding, Trading S Corp executed its first trading activity on December 9, 2009. It sold 19.165 shares of Fidelity Capital & Income for proceeds of $16. Trading S Corp executed its first day trade on December 10, when it purchased and sold 250 shares of Continental Airlines on the same day. Trading S Corp executed only 10 additional day trades during the remainder of its existence. In total, Trading S Corp bought $159,673 in securities and sold $158,204.

D.      Dissolution and Additional Transfers

On or before December 10, 2009, petitioners met again with Mr. Shanks and began taking steps to dissolve Trading S Corp and distribute its assets. Petitioners filed the required documents with the Texas secretary of state to terminate Trading S Corp, effective December 31, 2009. On December 14, Mr. Daichman signed a transfer and assignment of his interest in Daichman LLC to Trading S Corp, retroactively effective December 2. That same day, acting in his capacity as president of Trading S Corp, he signed another Transfer and Assignment of

---

[6]Petitioners did not call the BTEC business partner to testify as to his now-dissolved day trading corporation.

[*9] Trading S Corp's interest in Daichman LLC to Investment LP, retroactively effective December 3. Trading S Corp then transferred its remaining cash and marketable securities, totaling $100,052, to Investment LP on December 21. On December 24, Trading S Corp transferred its only remaining asset, the 98% limited partnership interest in Investment LP, in equal parts to petitioners, with each petitioner receiving a 49% limited partnership interest. In addition, petitioners transferred a 1% limited partnership interest in Investment LP to each of three trusts established for the benefit of their three sons, effective December 31, 2009.

### E. Legal Fees

Mr. Shanks billed petitioners a flat fee of $20,000 for legal services related to the formation of the Standish entities. Petitioners paid the fee in two installments of $10,000 at their initial meeting in November and their second meeting in December. Mr. Shanks did not charge petitioners an additional fee for the December meeting or the dissolution of Trading S Corp in December 2009.

## III. Preparation of Returns

For the 2009 tax year, petitioners' individual income tax return, as well as the tax returns for Trading S Corp and Investment LP, were prepared by John Herne, a licensed certified public accountant who had been preparing petitioners' returns since 2006. Mr. Herne began discussing the preparation of petitioners'

[*10] 2009 return in July 2010. In the course of those discussions, Mr. Daichman explained to Mr. Herne the mechanics of the transactions involving the Standish entities, providing graphs and illustrations depicting how the tax strategy worked.

Petitioners timely filed their 2009 joint individual income tax return on October 15, 2010. On that return they reported, among other items, wages of $699,373 and nonpassive partnership income of $1,400,136 from BTEC LP. They also claimed an ordinary loss deduction on Schedule E of $2,099,090 from Trading S Corp, reporting adjusted gross income of –$20,106 and tax liability of zero.

Trading S Corp filed its initial and final income tax return on Form 1120S, U.S. Income Tax Return for an S Corporation, for the 2009 tax year on September 13, 2010. On its return, Trading S Corp reported gross receipts of $2,034,479 and cost of goods sold of $3,460,101, resulting in an ordinary loss of $1,425,622. It reported the values of the 49% limited partnership interests in Investment LP distributed to petitioners as gross receipts. To calculate the values of the distributed partnership interests, Mr. Herne used the cash, the value of the securities, and the value of the units of BTEC LP (held by Daichman LLC) that petitioners had transferred to Investment LP through Trading S Corp, then applied

[*11] a discount of 40% for lack of control and marketability. Trading S Corp's gross receipts for 2009 were computed as follows:[7]

| | |
|---|---|
| Cash and marketable securities | $1,750,516 |
| BTEC LP units | 1,709,483 |
| Total asset value | 3,459,999 |
| Ownership interest acquired--98% | 3,390,799 |
| Discount for lack of control and marketability--40% | 2,034,479 |
| Computed gross receipts | 2,034,479 |

Trading S Corp reported as cost of goods sold its alleged total basis in Investment LP, which Mr. Herne calculated as follows:[8]

| | |
|---|---|
| Cash transferred from Trading S Corp to Investment LP | $838,765 |
| Marketable securities transferred from Trading S Corp to Investment LP | 911,853 |
| Value of 1,282 units of BTEC LP | 1,709,483 |

---

[7]These amounts represent the value petitioners claimed in preparation of the returns. The Court makes no finding as to the actual value of the assets distributed.

[8]In computing the cost of goods sold for Trading S Corp, Mr. Herne relied on the value of the securities on the date the securities were transferred to Investment LP, rather than Trading S Corp's basis in those securities. In addition, Mr. Herne relied on Mr. Daichman's computation of his basis in the BTEC LP units. The Court makes no finding as to Mr. Daichman's actual basis in those units.

**[*12]** Computed cost of goods sold                            3,460,101

Trading S Corp additionally reported interest income of $13, ordinary dividends of $1,019, and a net short-term capital loss of $540 from its trades of marketable securities between December 4 and 23, 2009.

Mr. Herne prepared Trading S Corp's return with the assistance of Mr. Shanks. Mr. Shanks advised Mr. Herne to report the transactions as gross receipts and cost of goods sold and provided Mr. Herne with discounts and other information used to compute those amounts. In accordance with the instructions of Mr. Shanks, Trading S Corp reported the distribution of the partnership interests as gross receipts and cost of goods sold in order to produce an ordinary loss, rather than a capital loss, and thus offset Mr. Daichman's income from BTEC LP.

On October 14, 2010, Trading S Corp submitted, and respondent's Ogden Service Center subsequently received but did not process, a second income tax return for its 2009 tax year (second return). On the second return, Trading S Corp increased its claimed loss deduction to $2,099,090, maintaining the same claimed cost of goods sold of $3,460,101 but decreasing its claimed gross receipts to $1,361,011. On the second return, Trading S Corp calculated its claimed gross receipts as follows:

| | |
|---|---:|
| [*13] Cash and marketable securities | $1,750,516 |
| Ownership interest acquired--98% | 1,715,506 |
| Dissolution discount--40% | 1,029,303 |
| Subtotal cash and marketable securities | 1,029,303 |
| BTEC LP units | 1,709,483 |
| Ownership interest acquired--98% | 1,675,293 |
| Dissolution discount--40% | 1,005,176 |
| Minority interest discount--45% | 552,847 |
| Litigation discount--40% | 331,708 |
| Subtotal BTEC LP units | 331,708 |
| Total computed gross receipts | 1,361,011 |

As with the first return, Mr. Herne prepared the second return with the assistance of Mr. Shanks, who provided him with the adjusted discounts.

Mr. Herne also prepared Form 1065, U.S. Return of Partnership Income, for Investment LP. On its return, Investment LP reported no gross receipts or sales, no deductions, and no business income or loss.

IV.  Examination, Penalty Approval, and Appeal

Respondent selected petitioners' 2009 return for examination. The revenue agent examining the return concluded that petitioners were not entitled to the claimed loss deduction and that they were liable for an accuracy-related penalty

[*14] under section 6662(a).  On January 27, 2014, the immediate supervisor of the revenue agent approved the revenue agent's conclusion to impose the accuracy-related penalty on the basis of a substantial understatement of income tax.  See sec. 6662(b)(2).  On February 14, 2014, the revenue agent issued to petitioners Letter 950 and an accompanying examination report (RAR).  The RAR proposed additional income tax of $447,966 and an accuracy-related penalty under section 6662(a) of $90,353.20.  The letter offered petitioners the options of accepting the proposed adjustments or appealing them to the Internal Revenue Service (IRS) Appeals Office.

Petitioners requested an appeal of the proposed adjustment with the IRS Appeals Office.  The appeal was unsuccessful, and respondent, through his Appeals Office, issued the notice of deficiency on March 12, 2015.  In the notice, respondent determined a deficiency of $1,163,751 and a section 6662(a) accuracy-related penalty of $231,990.20.  Before the issuance of the notice of deficiency, the Appeals officer assigned to petitioners' case concluded that the proposed deficiency should be increased above that determined by the revenue agent, and that imposition of the penalty was appropriate on the proposed deficiency and the increase thereto.  The immediate supervisor of the Appeals officer approved that conclusion on March 10, 2015.

**[*15]**                                        OPINION

I.      Introduction

Petitioners claimed a loss deduction of $2,099,090 in connection with the dissolution of Trading S Corp. Respondent contends that the deduction should be disallowed on the grounds that the transactions generating the reported loss lacked economic substance; that Trading S Corp was not a trade or business and that the transaction was not entered into for profit, as required by section 165(c); that petitioners have failed to show that they incurred a loss under sections 331 and 336; and that petitioners understated the value of the distributed assets.[9] Respondent additionally determined that petitioners are liable for an accuracy-

---

[9]In the notice of deficiency, respondent disallowed the cost of goods sold claimed by Trading S Corp but made no adjustment to gross receipts, resulting in an increase in income of $3,460,101. The parties now agree that Trading S Corp had neither gross receipts nor cost of goods sold and dispute only whether the claimed loss deduction of $2,099,090 should be disallowed.

**[\*16]** related penalty under section 6662(a).[10] For the reasons discussed below, the Court will deny petitioners' claimed loss deduction and sustain the penalty.[11]

## II.    Economic Substance

A taxpayer is generally free to structure his business transactions as he wishes, even if motivated in part by a desire to reduce taxes. Gregory v. Helvering, 293 U.S. 465, 469 (1935); see also Smith v. Commissioner, T.C. Memo. 2017-218, at \*15. Transactions which do not vary control or change the flow of economic benefits, however, are to be dismissed from consideration. See Higgins v. Smith, 308 U.S. 473, 476 (1940). The economic substance doctrine allows courts to enforce the legislative purpose of the Code by preventing taxpayers from reaping tax benefits from transactions lacking economic reality. Klamath Strategic Inv. Fund v. United States, 568 F.3d 537, 543 (5th Cir. 2009).

---

[10]In the notice, respondent determined that petitioners are liable for the underpayment penalty on the basis of negligence and a substantial understatement of income tax. On May 21, 2018, the Court reopened the record to admit evidence of respondent's compliance with the penalty-approval requirements of sec. 6751(b). Respondent acknowledged that approval was not obtained with respect to the penalty for negligence or disregard of rules or regulations and concedes that point. Respondent now argues only that petitioners are liable for the penalty on the grounds of a substantial understatement of income tax.

[11]The parties briefed a number of evidentiary objections that the Court had reserved during trial. Those objections not addressed in this opinion have been resolved by order dated August 31, 2020.

[*17] A court may disregard a transaction for Federal income tax purposes, even one that formally complies with the Code, if the transaction has no effect other than generating an income tax loss. See Knetsch v. United States, 364 U.S. 361 (1960); Smith v. Commissioner, at *16. Whether a transaction has economic substance is a factual determination for which the taxpayer bears the burden of proof. United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 456 (1950); Smith v. Commissioner, at *16.

An appeal in this case would lie with the U.S. Court of Appeals for the Fifth Circuit. See sec. 7482(b)(1)(A). Accordingly, the Court follows the law of that circuit with respect to its interpretation of the economic substance doctrine.[12] See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Fifth Circuit has interpreted the economic substance doctrine as a conjunctive multifactor test. Klamath Strategic Inv. Fund, 568 F.3d at 544. Within the Fifth Circuit, a transaction will be respected for tax purposes only if: (1) it has economic substance compelled by business or regulatory realities; (2) it is imbued with tax-independent considerations; and (3) it

---

[12]Sec. 7701(o), which codified the economic substance doctrine, applies only to transactions entered into after March 30, 2010, and is therefore not applicable in the present case. See Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, sec. 1409(e)(1), 124 Stat. at 1070.

**[\*18]** is not shaped totally by tax avoidance features. Id.; see also Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978). The transaction must therefore exhibit an objective economic reality, a subjectively genuine business purpose, and some motivation other than tax avoidance. Southgate Master Fund, L.L.C. v. United States, 659 F.3d 466, 480 (5th Cir. 2011); Smith v. Commissioner, at \*16-\*17. The Court of Appeals has recognized, however, that there is "near-total overlap between the latter two factors", reasoning that "[t]o say that a transaction is shaped totally by tax-avoidance features is, in essence, to say that the transaction is imbued solely with tax-dependent considerations." Southgate Master Fund, L.L.C., 659 F.3d at 480 & n.40.

Petitioners contend that they organized Trading S Corp as a vehicle for Mr. Daichman to engage in day trading while still working at BTEC LP. They claim that they transferred the cash and securities to Trading S Corp in order to finance the day trading activities and that the transfers of assets to Investment LP through Trading S Corp were for asset protection purposes. It is clear from the record, however, that Trading S Corp existed only to generate a tax loss. Despite the time, effort, and cost of establishing the company, within 17 days of organization Mr. Daichman had begun taking steps to dissolve Trading S Corp by December 10, before any actual significant trading had occurred. Petitioners claim that Mr.

**[*19]** Daichman quickly realized that the demands of his business did not allow for a successful day trading operation, and he promptly abandoned the activity for that reason. As discussed in greater detail below, the Court does not find petitioners' claims with respect to their purpose for organizing and dissolving Trading S Corp to be credible and, moreover, concludes that the transactions involving the Standish entities fail to satisfy the economic substance doctrine as articulated by the Court of Appeals for the Fifth Circuit.

### A.    Objective Economic Reality

The first prong of the economic substance inquiry requires that the transaction have economic substance compelled by business or regulatory realities, often referred to as "objective economic reality". A transaction lacks economic substance if it does not "vary control or change the flow of economic benefit[s]". Klamath Strategic Inv. Fund, 568 F.3d at 543 (quoting Higgins v. Smith, 308 U.S. at 476). Under the objective economic inquiry, the Court examines whether the transaction affected the taxpayer's financial position in any way, such as whether the transaction "either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so." Southgate Master Fund, L.L.C., 659 F.3d at 481 (fn. ref. omitted). A circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes. Merryman v.

[*20] Commissioner, 873 F.2d 879, 882 (5th Cir. 1989), aff'g T.C. Memo. 1988-72; see also Smith v. Commissioner, at *16-*17.

On this level, the transactions petitioners executed to generate the claimed loss deduction failed to alter their economic position in any way that affected objective economic reality. The transfers of assets were effectively a circular flow of funds among related entities used to generate an artificial tax loss to offset petitioners' 2009 income. Petitioners transferred substantial assets to Trading S Corp, their wholly owned S corporation, which then transferred those assets to Investment LP. Trading S Corp owned a 98% limited partnership interest in Investment LP, while petitioners, as cotrustees of the Daichman Trust, owned the remaining 2% as general partners. Within days of the transfers to Investment LP, Trading S Corp dissolved, distributing its 98% interest in Investment LP (including the assets petitioners had contributed to Trading S Corp) to petitioners. Petitioners claimed a loss deduction on their 2009 tax return by calculating the values of the distributed partnership interests based on substantial discounts. Petitioners had constant control over the assets and entities at all relevant times, however, and neither the contribution to Trading S Corp nor its dissolution affected petitioners' position or caused "real dollars to meaningfully change hands". The form of petitioners' ownership of the assets may have changed, but

**[*21]** the substance did not. There was no realistic risk or possibility that the funds or assets would change hands at any point. Accordingly, the Court holds that the transactions involving the Standish entities lacked objective economic reality and therefore fail to satisfy the first prong of the economic substance doctrine, as defined by the Court of Appeals for the Fifth Circuit.

Although failure to satisfy any one prong of the economic substance doctrine is sufficient for a finding that the transaction lacked economic substance, the Court will address the remaining two prongs below.

B.      Subjective Purpose

The second and third prongs of the economic substance doctrine overlap and derive from an inquiry into the taxpayer's purpose, i.e., whether the taxpayer had a subjectively genuine business purpose or some motivation other than tax avoidance. See Southgate Master Fund, 659 F.3d at 481. Accordingly, the Court addresses the two factors together.

Taxpayers are not prohibited from seeking tax benefits in conjunction with seeking profits for their businesses, and a taxpayer who acts with mixed motives of profit and tax benefits may nonetheless satisfy the subjective test. Id. at 481-482. Tax-avoidance considerations may not be the taxpayer's sole purpose for entering into a transaction, however. Salty Brine I, Ltd. v. United States, 761 F.3d

[*22] 484, 495 (5th Cir. 2014).  The fact that a taxpayer enters into a transaction primarily to obtain tax benefits does not necessarily invalidate the transaction under the subjective purpose inquiry.  Compaq Comput. Corp. & Subs. v. Commissioner, 277 F.3d 778, 786 (5th Cir. 2001), rev'g 113 T.C. 214 (1999).

Petitioners claim that they organized Trading S Corp for the purpose of day trading.  Petitioners' actions, however, are not consistent with a profit motive, particularly from a well-educated and experienced business person such as Mr. Daichman.  Mr. Daichman had no past experience in day trading, yet he conducted no prior research into the activity, did not consult any references, and did not otherwise seek advice before expending the time and resources to establish Trading S Corp.

Furthermore, after setting up Trading S Corp, Mr. Daichman dissolved it almost immediately.  Petitioners claim that Mr. Daichman tried his hand at day trading for a bit but, finding that he was not making any money and did not have sufficient time, decided not to continue.  This claim is contradicted by the record.  Correspondence dated December 10, 2009, from Mr. Shanks to petitioners indicates that petitioners and Mr. Shanks had met to discuss the dissolution of Trading S Corp no later than that date.  December 10 is also the date on which Trading S Corp executed its first stock purchase.  In other words, Mr. Daichman

[*23] began taking steps to dissolve Trading S Corp, at the latest, after completing a single day trade, and likely before any day trading at all. The overwhelming majority of the day trades that Trading S Corp did transact were executed after Mr. Daichman had begun the process of dissolving the company.

Before Trading S Corp engaged in any trading, Mr. Daichman caused the company to transfer nearly all of its assets to Investment LP, a newly formed company that never engaged in any business activity and otherwise held no assets. The transfers to Investment LP served no business purpose and offered no potential for profit. Even if the Court were to accept petitioners' contention that the transfer of assets to Investment LP was for asset-protection purposes, which it does not, such a goal was unrelated to Trading S Corp's purported business activity, and petitioners identify no business motive or profit potential for using Trading S Corp as a conduit for that transfer. Nor do petitioners identify any business purpose or potential for profit in transferring the BTEC LP units (owned by Daichman LLC) to Investment LP through Trading S Corp. These transfers served only to increase the claimed loss when Trading S Corp dissolved later that month.

The Court concludes that petitioners intended from the beginning that they would organize and dissolve Trading S Corp within the same year to generate a

[*24] tax loss in an effort to reduce their 2009 income tax liability. Petitioners did not have a genuine business purpose for establishing the Standish entities, and the actions were taken solely for tax-motivated reasons. Mr. Daichman knew he would be receiving substantial income from BTEC LP in 2009 and sought to generate a tax loss to offset it. Mr. Shanks charged petitioners a flat fee of $20,000 to create the entities at their inception but did not charge an additional fee to prepare and file the dissolution documents. The Court is left with the conclusion that Mr. Shanks offered petitioners a prepackaged tax strategy, one that he offered to numerous clients in 2009, designed to create an artificial loss through a circular flow of assets, the application of substantial discounts, and the misreporting of the resulting loss as an ordinary loss, rather than a short-term capital loss. When the initial loss calculation failed to eliminate fully petitioners' income, petitioners had a second return prepared for Trading S Corp, increasing the discounts and thereby the loss, and offsetting all of petitioners' income.

The Court holds that the transactions at issue did not have economic substance and that petitioners are not entitled to the claimed loss deduction therefrom for 2009. Accordingly, the Court does not find it necessary to address respondent's alternative arguments.

**[\*25]** III.    Accuracy-Related Penalty

Respondent determined that petitioners are liable for an accuracy-related penalty pursuant to section 6662(a) for 2009.  Section 6662(a) and (b)(1) and (2) imposes an accuracy-related penalty equal to 20% of the portion of an underpayment of tax required to be shown on a tax return that is attributable to "[n]egligence or disregard of rules or regulations" or a "substantial understatement of income tax."  Negligence includes "any failure to make a reasonable attempt to comply with the provisions of this title".  Sec. 6662(c).  An understatement of income tax is a "substantial understatement" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).

The Commissioner bears the burden of production with respect to an individual taxpayer's liability for any penalty, addition to tax, or additional amount, requiring the Commissioner to come forward with sufficient evidence indicating that imposition of the penalty is appropriate.  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  The Court has previously held that, as part of that burden, the Commissioner must produce evidence that he complied with the procedural requirements of section 6751(b)(1).  See Graev v. Commissioner, 149 T.C. 485, 492-493 (2017), supplementing and overruling in part 147 T.C. 460 (2016).  Section 6751(b)(1) requires the initial determination of

[*26] certain penalties to be "personally approved (in writing) by the immediate supervisor of the individual making such determination".[13] See Graev v. Commissioner, 149 T.C. at 492-493; see also Clay v. Commissioner, 152 T.C. 223, 248 (2019) (quoting section 6751(b)(1)).

Where the taxpayer has challenged the Commissioner's penalty determination, the Commissioner must come forward with evidence of proper penalty approval as part of his initial burden of production under section 7491(c). Frost v. Commissioner, 154 T.C. __, __ (slip op. at 20) (Jan. 7, 2020). Once the Commissioner makes that showing, the taxpayer must come forward with contrary evidence. Id. The Court has previously concluded that the supervisory approval must be secured no later than (1) the date on which the IRS issues the notice of deficiency or (2) the date, if earlier, on which the IRS formally communicates to the taxpayer the Examination Division's determination to assert a penalty and notifies the taxpayer of his right to appeal that determination. Clay v. Commissioner, 152 T.C. at 249.

Respondent produced a copy of the Civil Penalty Approval Form, signed on January 27, 2014, by the immediate supervisor of the revenue agent who examined

_____

[13]Respondent concedes that approval was not obtained with respect to the accuracy-related penalty for negligence or disregard of rules or regulations.

[*27] petitioners' return and approving the imposition of the underpayment penalty for a substantial understatement of income tax, but not for negligence.[14] Respondent formally communicated his determination to assert a penalty against petitioners in the RAR and the accompanying Letter 950, which the revenue agent issued to petitioners on February 14, 2014. Petitioners do not claim, and the record does not support a conclusion, that respondent communicated his initial penalty determination to petitioners before the date that the examining agent's manager signed the Civil Penalty Approval Form. Moreover, following petitioners' unsuccessful appeal, the Appeals officer assigned to petitioners' case received approval for the imposition of the penalty on the increased deficiency amount before communicating that determination to petitioners. Accordingly, respondent has satisfied his burden with respect to section 6751(b)(1) for the substantial understatement penalty.

---

[14]Trial of this case was held, and the record was closed, before the issuance of the Court's latest Opinion in Graev. After that Opinion was released, the Court ordered respondent to file a response addressing the effect of sec. 6751(b) on this case and directing the Court to any evidence of sec. 6751(b) supervisory approval in the record, and petitioners to respond. Respondent was unable to direct the Court to any such evidence and moved to reopen the record to introduce additional evidence. The Court granted the motion and additionally allowed petitioners to engage in discovery regarding the civil penalty approval.

**[*28]** Because respondent has satisfied the requirements of section 6751(b)(1), the Court now turns to the remainder of respondent's initial burden. The Court has held that petitioners are not entitled to the claimed loss deduction of $2,099,090. By inappropriately claiming a loss deduction of $2,099,090, petitioners understated the tax required to be shown on their return by more than 10%, which is greater than $5,000. See sec. 6662(b)(2). Therefore, the understatement was substantial, and petitioners are liable for the section 6662(a) penalty unless, as they claim, there was reasonable cause for the underpayment.

Section 6664(c)(1) provides an exception to the section 6662(a) penalty with respect to any portion of an underpayment if the taxpayer acted with reasonable cause and in good faith. The Court determines whether a taxpayer acted with reasonable cause and in good faith on a case-by-case basis, taking into account all pertinent facts and circumstances, including the taxpayer's efforts to assess the proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional tax adviser. Sec. 1.6664-4(b)(1), Income Tax Regs.; see also United States v. Boyle, 469 U.S. 241, 250 (1985).

To show reliance on an adviser, a taxpayer must show that (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer gave the adviser the necessary and accurate information; and

**[\*29]** (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Prudhomme v. Commissioner, 345 F. App'x 6, 10-11 (5th Cir. 2009), aff'g T.C. Memo. 2008-83. The advice must be based upon all pertinent facts and circumstances, taking into account the taxpayer's purposes for entering into a transaction and for structuring a transaction in a particular manner. Sec. 1.6664-4(c)(1)(i), Income Tax Regs. Moreover, the advice "must not be based on unreasonable factual or legal assumptions * * * and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.; see also Brinkley v. Commissioner, 808 F.3d 657, 669 (5th Cir. 2015), aff'g T.C. Memo. 2014-227. A taxpayer's education and business experience are relevant to the determination of whether the taxpayer acted with reasonable reliance on an adviser and in good faith. Prudhomme v. Commissioner, 345 F. App'x at 11; sec. 1.6664-4(c)(1), Income Tax Regs. Due care does not require that the taxpayer challenge his or her attorney's advice or independently investigate its propriety. Streber v. Commissioner, 138 F.3d 216, 219 (5th Cir. 1998), rev'g T.C. Memo. 1995-601.

[*30] Petitioners contend that they had reasonable cause for any underpayment because they relied on the competent advice of Mr. Shanks and Mr. Herne in determining how the transactions should be reported and how the discounts should be applied. They argue that the Code, particularly its provisions involving S corporations, is inherently complex and that it would be neither fair nor reasonable to expect them to second-guess their advisers. Regardless of whether petitioners' advisers were sufficiently competent or whether petitioners provided them with necessary and accurate information, however, the Court holds that petitioners are liable for the penalty because they were not acting in good faith. As discussed above, the evidence shows that Mr. Daichman, a sophisticated and experienced businessman, created and dissolved Trading S Corp as part of a prearranged plan to generate an artificial tax loss. Petitioners never intended to conduct business through Trading S Corp and began taking steps to dissolve the company almost immediately. Rather, petitioners organized the entity with the goal of minimizing their 2009 income tax liability. Petitioners maintained control over the assets at all relevant times, yet claimed a loss deduction in excess of $2 million. They knew from the start that Trading S Corp was not a bona fide business and that the transfers did not meaningfully change the ownership of their

**[\*31]** assets. Petitioners' knowledge alone is sufficient to negate a reliance defense. See, e.g., Smith v. Commissioner, at \*28-\*29.

Accordingly, the Court holds that petitioners are liable for the section 6662(a) and (b)(2) penalty for a substantial understatement of income tax and that petitioners did not act reasonably or in good faith.

IV.    Conclusion

The Court holds that petitioners are not entitled to the claimed loss deduction of $2,099,090. In addition, petitioners are liable for the section 6662(a) and (b)(2) accuracy-related penalty. In reaching this holding, the Court has considered all arguments made and, to the extent not discussed herein, has concluded that such arguments are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.